E. JOHNSON & HUSBAND *v.* P. BLOODWORTH—B. TOLEDANO & TAYLOR, Intervenors and Appellants.

The unpaid vendor of a slave sold by private act unrecorded, may enforce the implied dissolving condition against his vendee, to the prejudice of the mortgage creditor of the latter.

APPEAL from the District Court of Natchitoches, *Chaplin*, J. *H. Safford*, for plaintiff and appellee. *J. B Smith*, for defendent. *J. G. Campbell & A. H. Pierson*, for intervenors and appellants.

SPOFFORD, J. It is agreed that the main question to be here solved is this: When the vendee of a slave, holding by private act unrecorded, has mortgaged the slave to a third person by public act duly registered, can the unpaid vendor enforce the implied dissolving condition against his vendee, to the prejudice of the mortgage creditor of the latter?

The principles which, in our opinion, must control the decision of this question are embodied in a few articles of the Civil Code.

JOHNSON
a. ·
BLOODWORTH.

"The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed. It does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place." C. C. 2040.

"A resolutory condition is implied in all commutative contracts to take effect in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of the breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance." C. C. 2041.

"If the buyer does not pay the price, the seller may sue for the dissolution of the sale." C. C. 2539.

"Obligations are *extinguished*    *    *    *    * by the effect of the dissolving condition which has been explained in the preceding chapter." C. C. 2126.

"Such as only have a right that is suspended by a condition, and may be extinguished in certain cases (in the French text, *ou résoluble dans certains cas, ou sujet à rescision*) can only agree to a mortgage subject to the same conditions, and (*ou*) liable to the same extinction." C. C. 3268.

Our jurisprudence upon the topic of the resolutory condition in commutative contracts, so far as it has gone, is believed to be lucid and consistent.— Little remains to be said upon that branch of the subject which has been fathomed and expounded, in a few terse paragraphs, by the clear intellect of the late Judge Martin. In *Mortee* v. *Roach's Syndic*, 8 L. R. 83; this learned Judge, as the organ of the court, remarked: "A sale is a synallagmatic contract which imposes on the vendor the obligation of delivering the thing sold and requires of the vendee the payment of the price. In the case of reciprocal obligations, the party who does not perform his part of the engagement, cannot avail himself of any rights resulting to him from the contract; consequently, the other party may demand the rescission of the contract from the defaulting party.

"The insolvent debtor not having paid the price was not the absolute owner of the slaves; and his right to the property was therefore not indefeasible.

"The cession or surrender of the insolvent debtor's rights could not, and did not, change the character and nature of those rights. They remained the the same; for the debtor could only cede the rights he had, and in the condition they were at the time. What was conditional and defeasible in his hands, did not become absolute and indefeasible in the hands of his creditors. The plaintiff did not not contravene the order staying all proceedings against the person and property of the insolvent, by exercising his right (to sue for the dissolution) against the syndic.

"The slaves in controversy, not being the absolute property of the ceding debtor, and his defeasible right to them being annihilated by the rescission of the sale, it follows that they make no part of the property surrendered; and their price cannot be diminished, or they in any manner held liable by the syndic of the insolvent's estate, for the costs and charges of the *concurso*." See also, upon the general subject. *Canal Bank* v. *Copelond*, 15 L. R. 76; *Power* v. *Ocean Insurance Company*, 19 L. R. 28; *Fulton* v. *Her Husband*, 7 Rob. 73; *Chretien* v. *Richardson*, 6 Ann. 2; *Shields* v. *Lafon*, 7 Ann. 1351.

But it is contended in the present case that the resolutory condition, to be operative against a mortgagee of the vendee, is required to be notified to the public by a registry of the act of sale, before the mortgage by the vendee is registered. No judicial authority is quoted for such an opinion. No law is cited which, in our judgment, refers in terms or by clear implication to such a necessity.

Registry laws are artificial rules, the creatures only of positive legislation. As they tend to multiply forms in the transmission of property, and to restrict the natural right of man to do what he will with his own, they have seldom, if ever, been extended by judicial construction to cases not within their plain and obvious intendment.

It is true the vendor of an immovable or slave only preserves his *privilege* as against third persons by recording the act of sale. C. C. 3238. But it is impossible to confound the resolutory action with the vendor's privilege. The former is not a mere appendage of the latter. It is a distinct substantive, and independent right or remedy. " Le vendeur en effet, ayant ici deux droits distincts, celui d'agir pour son payement, en créancier privilégié et non en créancier ordinaire, puis celui de reprendre la chose si on ne le paye pas, la perte du premier le réduit sans doute à n'avoir plus que le second, mais il a toujours ce second : il n'est plus que créancier ordinaire, au lieu d'être créancier privilégié ; mais il est toujours créancier, il est toujours vendeur non payé, et il peut dès lors faire résoudre la vente." 6 Marcardé, p. 289, C. N. 1656.

The fact that the lawgiver has said that registry shall be essential to the preservation of the vendor's privilege upon immovables and slaves, and has not said that the same formality shall be necessary to preserve the right of demanding a dissolution of the sale for non-payment of the price, implies that registry is immaterial to the existence of the latter right. *Qui dicit de uno negat de altero.*

The argument is substantially the same under our Code as under the Napoleon Code, for the articles relative to both remedies and to the necessity of inscription to preserve the vendor's privilege, are borrowed from the latter Code. So clear was it under the French Code, that the loss of the vendor's privilege, for want of registry or other cause, did not involve a forfeiture of the vendor's right to resort to the dissolving condition, that there seems to have been no dissent upon this point for more than forty years among the French tribunals and commentators. See Persil (Art. 2103) Duvergier (vente I. 551,) Duranton, (XVI. 362,) Troplong (Hyp. I. 222,) Toullier (VI. 577,) and the numerous *arrêts* of various tribunals cited by Marcadé, (*loc. cit.*) When jurists of a race so much addicted to theoretical speculation, and so little addicted to reverence for each other's opinions, draw a conclusion from the Code in which they unanimously concur, we may, perhaps, set it down for an obvious truth.

The policy of the law has long been a matter of discussion in France. But it was never supposed there that it was competent for the tribunals of justice to supply what was thought by many to be a defect in the law, giving rise to occasional hardships. The legislative branch of the French government was often appealed to for a reform in this particular, but, for a long time without success. Recently the experiment has been tried, and by Art. 7 of the Transcription law of the 23d March, 1855, it was declared that the resolutory action established by Art. 1654 of the Napoleon Code cannot be brought, *after the vendor's privilege is extinguished*, to the prejudice of third persons who have

JOHNSON
*v.*
BLOODWORTH.

acquired rights upon the immovable under the vendee, and have complied with the laws prescribed for the preservation of such rights.

The Legislature of Louisiana has not yet seen fit to impose such a limitation upon the exercise of the resolutory action with regard to immovables and slaves. The dissolving condition for non-payment of the price stands with us, as it stood in France before the law of the 23d March, 1855, a condition wholly independent of the vendor's privilege, coëval with and parcel of the contract of sale itself. The vendee takes the property subject to the condition in favor of his unpaid vendor; as there is no law requiring a registry to preserve this condition, it follows, according to Art. 3268 of the Louisiana Code, that the vendee can only mortgage the property, subject to the same condition; the general rule of logic and justice, *nemo plus juris in alium transferre potest quam ipse habit* being unqualified in this respect, by any arbitrary rule imposed by the Legislature, the third person who accepts a mortgage from the naked possessor without a recorded title, and afterwards finds it ousted by the effect of the condition on which alone his mortgage had been enabled to acquire possession, has only himself to blame for not having required an exhibition of his mortgagor's title and receipts for the price. If he suffers, he pays the penalty of his own heedlessness in taking a mortgage upon an immovable or slave from one who displayed no other proof of unconditional ownership than possession merely.

We do not perceive that our laws with regard to the registry of *sales* affect the present question. Those laws were designed to protect creditors of and purchasers from vendors against the unrecorded claims of *sous-seing privé* vendees and those claiming under such vendees. If the sale of the slaves in question from the present plaintiff to *Portevint Bloodworth* is to be considered null and void, for want of registry, as to persons claiming under *Bloodworth* who are certaily third persons, then his mortgagees, the opponents B. *Toledano & Taylor*, have accepted a mortgage *a non domino*, and are in a worse plight than we take them to be with a mortgage from one who was the owner subject to the dissolving condition.

The laws relative to the registry of mortgages are also, in our view, foreign to the subject before us.

Something has been said about the danger of leaving this tacit right unrestricted by a registry law. Upon this point it is possible that opinions may differ. It suffices for us to say that, when statutes are free from ambiguity and absurdity, we are not called upon to investigate their expediency. Under a government of written laws, the judiciary is but the interpreter of the legislative will. The reform of the law, the redress of public grievances flowing logically from existing statutes, are high prerogatives which belong to the Legislative domain.

We deem it proper, however, to observe that we do not think such injurious consequences as some of those which have been surmised can result from the law as it now stands.

The prescription of five years under Art. 3444 of the Civil Code will protect the third possessor of a slave against an action of this character; slaves bought in other States of the Union are not bought subject to the dissolving condition which is peculiar to the civil law; and movables are unaffected by the doctrine of this case. Such property being governed by distinct regulations which preclude it from being followed into third hands by the dissolving condition.

Upon the other points raised by B. *Toledano & Taylor*, the appellants in

this case, we also concur in the opinion of the District Judge. The interve-nors contended that the vendee *P. Bloodworth* assigned to his vendor, the plaintiff, his share of *James Bloodworth's* succession in payment of the slaves, and that her neglect to notify the administrator of that succession of the trans-fer, was the cause of her having lost the price.

The evidence shows that this was only a mode of payment left to the option of the vendee, ⌐who bound himself to pay in cash if the amount was not re-alized to the plaintiff from the source indicated; but that, before entering into the act of the purchase, the vendee, had put it out of his power to pay the plaintiff in that mode, by assigning all his interest in the succession of *James Bloodworth* to *Moses Greenwood & Co.*, who have been made parties to this suit and claim the benefit of the assignment, and that no diligence by the plaintiff could have enabled her to get the priority of *Moses Greenwood & Co.*, because they notified the administrator of the assignment to them before *P. Bloodworth* bought the slaves in question.

It is, therefore, ordered and decreed, that the judgment of the District Court be affirmed with costs.

It is, further ordered and decreed, that this opinion and decree be for-warded to the clerk of the Supreme Court at Alexandria, in order that the same may be there filed, and notice thereof given in conformity with the agreement of the parties on file.

MERRICK, C. J., dissenting. I am not able to concur in the decree pronoun-ced by my colleagues in this very important case.

The plaintiff *Eveline Johnson* and her brother *Poitevint Bloodworth*, were children and heirs of *James Bloodworth* deceased. On the third day of March 1853, at the succession sale of *James Bloodworth*, deceased, the plaintiff bought the two negroes in controversy, *Henry* and *Epraim.* Sometime between the 13th day of May, and the 1st day of October, of the same year, the plaintiff through the agency of her husband executed an act under private signature in these words, viz:

"It is agreed between *Poitevint Bloodworth, jr.*, and *Francis Johnson*, rep-resenting his wife, *Eveline Johnson*, that *Poitevint Bloodworth, jr.*, shall re-ceive from the estate of *Col. James Bloodworth* late of this parish, deceased, the slave *Henry*, a negro man aged about thirty-eight years, for the price of fourteen hundred dollars, and the slave *Ephraim*, a boy about nine years, for the price of five hundred dollars, and account to the estate for these respective sums, out of the share coming from said estate to him, the said *Poitevint*, and if so much shall not come to him, he is to pay the balance in cash. The said slaves have been delivered to the said *Poitevint*, and he hereby acknowledges possession of the same.

NATCHITOCHES, (Signed.)                          P. BLOODWORTH,
Attest—                                                       F. JOHNSON.
ROSS E. BURKE,

This act was never recorded either in the mortgage or notarial records of the Recorder's office. On the 8th day of May, 1853, *P. Bloodworth* being indebted to *Moses Greenwood & Co.*, $2,229 55 and interest, by note, transfered to them as much of his interest in his father's succession as would be sufficient to pay said note and interest, and authorized and required the administrator to make payment to the holder of the note. This act was recorded in the mortgage re-cords, and notified to the administrator soon after its date, and in consequence

thereof, *Moses Greenwood & Co.*, were placed by the administrator on the tableau as assignees of the interest of *P. Bloodworth, jr.*, in the succession of *James Bloodworth* deceased. On the 29th day of June, 1853, *P. Bloodworth* being indebted to *B. Toledano & Taylor*, in the sum of $7,500, among other property, mortgaged these two slaves, then in his possession to them, to secure the said sum of money, describing the slaves in the act of mortgage as inherited by him from *James Bloodworth*, deceased. This mortgage was recorded on the 6th day of July, 1853, in the proper registry of mortgages. *Poitevint Bloodworth, jr.*, died about the middle of October, 1853. The slaves were inventoried as belonging to his estate against the protest of plaintiff's husband, her agent. The succession of *P. Bloodworth, jr.*, is insolvent and administered by a syndic.

It is evident, that were the plaintiff to claim the price of the slaves in the *concurso*, she would be defeated by the recorded mortgage of *B. Toledano & Taylor*. To obviate this difficulty, she has brought suit against the syndic, and alleged the sale to *P. Bloodnorth, jr.*, and averred that the price has not been paid, and praying a rescission of the sale under Art. 2539 of the Civil Code. *C. Toledano & Taylor* intervened in the suit, and among other things averred, that they have a better right to be paid out of the funds in the hands of the administrator than *Moses Greenwood & Co.*, and prayed that the plaintiffs demand be rejected.

It does not appear that the plaintiff ever notified the administrator of the transfer of *Poitevint Bloodworth's* interest in the estate to her. Indeed, it does not appear, but the transfer to *Moses Greenwood & Co.*, may have been made before that to the plaintiff. The question is presented, whether the vendor who has not recorded either in the notarial or mortgage records of the Recorder's office, the act of sale executed by him under private signature, can maintain an action to dissolve the sale as against mortgage creditors who have in good faith, had their mortgages recorded in the proper office against the vendee.

The case does seem to have been decided by our courts, and we are left to such conclusions as may seem most in consonance with the spirit of our legislation. A similar question arose under the Napoleon Code in France, and for a time raised doubt and discussion, but has been decided in several cases in the affirmative, and those decisions seem to meet the assent of those French jurists whose writings for the present, at least, seem to possess the weight of authority. These decisions, however, are not authoritative expositions of the law for us, and they are to be followed only when their conclusions are supported by reason, and do not conflict with our own laws and the general policy of our system of jurisprudence.

They rest in substance upon the following propositions:

1st. That the faculty of dissolving the sale upon non-payment of the price is in the nature of a condition.

2d. That the vendee cannot transfer to another a greater right than he himself possesses.

In developing these principles Toulier says, " Ces principes sont conformes à l'exacte justice, et les tiers qu'ils blessent n'ont pas raison de s'en plaindre ; car avant d'acquérir ou de prendre pour hypothèque des biens qui n'appartenaient pas incommutablement à celui avec lequel ils ont contracté, ils pouvaient et devaient s'assurer du titre en vertu duquel il était propriétaire." 6 Toul. No. 577.

Duranton remarks after commenting upon the *pactum commissorium* of the Roman laws, " Mais chez nous en l'absence même du pacte commissoire et quoique le vendeur ait suivi la foi de l'acheteur, en lui faisant terme s'il s'agit d'immeubles, et que l'acheteur ne paie pas au terme convenu, sans avoir juste cause de s'y refuser, le vendeur peut demander la résolution du contract, et par suite, revendiquer les immeubles qu'il a livrés si la résolution est prononcée.

Et son droit à cet égard n'est pas restreint à la personne de l'acheteur et de son héritier seulement ; il est écrit sur la chose et la suit en quelque main qu'elle passe tant qu'il subsiste.    L'acheteur lui-même n'a pu la transmettre à d'autres (Art. 2182), ni l'hypothéquer (Art. 2125), que sous l'affectation du droit du vendeur, qui n'a vendu et livré que sous la condition qu'il serait payé du prix ; *nemo plus juris in alium transfere potest quam ipse habet.   Ce point qui a fait d'abord quelque difficulté*, n'en fait plus aujourd'hui que maints arrêts ont confirmé cette doctrine.   C'est à l'acheteur d'un immeuble qui le reçoit d'un autre acheteur, à se faire représenter les quittances de celui-ci ; et l'on voit tout de suite que le défaut de représentation de ces quittances peut donner une juste crainte à l'acheteur d'être troublé dans sa possession, et par consé-quent le droit d'invoquer la disposition principale de l'Art. 1653, que nous venons d'expliquer.   Le vendeur peut donc agir contre le tiers, et il le peut même directement sans avoir besoin de faire prononcer préalablement la ré-solution du contrat avec l'acheteur ; mais il faut mettre ce dernier en cause, pour établir que le prix n'a pas été payé et que le vendeur n'a pas été satisfait de quelque autre manière." ·

Are the reasons adduced by the writers of the French law, such as ought to control the decisions of our courts ?   If it were not for the provisions of our law, in regard to the registry of mortgages and conveyances, and the classifi-cation of the dissolving condition with privileges, there would be no great difficulty in following the French decisions, and in answering the question in the affirmative.   We may assume, that the policy of our law, is, as far as pos-sible, to assure the vendee, mortgagee, or privilege creditor, who holds by re-corded title, in possession of the right, thus made known to all the world.   There is the more necessity for this, because a very large portion of the property of the citizens of the State consists in slaves, which are regarded as immovables, although they are subject to frequent changes of place, and ownership ; and much of this kind of property has been brought here from other States of this Union, and much held under acts under private signature, and there is not that facility of ascertaining the former proprietors, nor whether some former proprietor may, as in the case of landed estate, not remain unpaid.   In France, where land alone is held by many writers to be subject to a dissolution of the contract of sale for the non-payment of the price, in the hands of the third possessor, and where the population is much more permanent, and changes of proprietors much less frequent than our own, there is, correspond-ingly, much less inconvenience resulting from the rule, than there would be with us, and yet even the legislative department of that country has been compelled to interpose and correct what their courts have virtually held to be a *casus omissus*, and to supply by new enactments the evils resulting from the interpretations of their courts.

The Art. of the Code, upon which this action is based, applying equally to immovables, movables and slaves, is in these words : " If the buyer does not

89

pay the price, the seller may sue for the dissolution of the sale." C. C. 2539. See, also, 2040, 2041, and 2042. If it is not controlled by other legislation the action must be held to be well founded. The following Articles of the Civil Code, may be considered as having some bearing upon the construction to be given to the foregoing Art. (viz), Art. 2242. "Sales, or exchanges of real property and slaves, by instruments under private signature, are valid against *bone fide* purchasers and creditors, only from the day on which they are registered in the office of a notary, or from the time of the actual delivery of the things sold." Art. 2417. "The sale of any immovable or slaves made under private signature, shall have effect against the creditors of the parties, and against third persons in general, only from the day such sale was registered in the office of a notary, and the actual delivery of the things sold took place. But this defect of registering shall not be pleaded between the parties who shall have contracted in such act, their heirs or assigns who are as effectually bound by a sale under private signature, as if it were by public act."

Art. 3216 declares, that the vendor of a slave, has the privilege upon the slave, for the payment of the price. Art. 3238, is in these words: "The vendor of an immovable or slave, only preserves his privilege on the object, when he has caused to be duly recorded in the office for recording mortgages his act of sale, in the manner directed hereafter, whatever may be the amount due him on the sale." Art. 3314, "Conventional mortgage is acquired only by consent of the parties; and judicial and legal mortgages, only by the effect a judgment, or by operation of law. But *these mortgages are only allowed to prejudice third persons* when they have been publicly inscribed on records kept for that purpose, in the manner hereafter directed." Art. 3315. "By the words, *third persons*, used in the foregoing Art., are to be understood, all persons who are not parties to the act, or to the judgment, on which the mortgage is founded, *and who have dealt with the debtor either in ignorance* or before the existence of this right."

The Act of 26th March, 1813, provides that all sales &c., which shall not be recorded, agreably to the provisions of that Act, shall be utterly null and void to all intents and purposes, except between the parties to the same. The Act of 25th of March, 1810, provides that no notarial act, concerning immovable property, shall *have any effect against third parties*, until the same shall have been recorded in the office of the Judge of the parish, in which such immovable property is situated. 2 Moreau's Dig, p. 286. 7 N. S. 661. These statutes were reenacted in 1855. See Acts 1855, p. 335, and Revised Statutes, 453.

I think the object of the Civil Code, and the statutes of 1810 and 1813, was to secure the vendee, as well as all other innocent persons, against the latest claims of all prior vendors and mortgagees, upon property in the possession of any one holding as owner. It is objected, that no one can convey a greater right to a purchaser than he himself has. The maxim cited, is very far from being of universal appreciation. We know in the matter of sale, that the *bona fide* purchaser, by an apparent title, *a non domino*, becomes so far owner, as to make the fruits of the immovable his own, and under a short prescription, to become the absolute owner, which are certainly greater than his vendor possessed, and the same is conceded as to the recorded mortgage over the vendor's unrecorded privilege and mortgage. It is not true, *under our Code*, that the vendee, who has not paid the price, is not the owner of thing, and that, therefore, he cannot convey the *property* in the thing to another; for, it is expressly

declared, that the sale is considered to be perfect between the parties, and *the property is of right* acquired to the seller as soon as there exists an agreement for the object, and for the price thereof, although the object has not yet been delivered, nor the payment made, (C. C. 2431,) and after such contract the thing sold is at the risk of the buyer. C. C. 2442. *Res perit domino.* The vendor then conveys to the second vendee that which he has acquired, *the property* of the thing which is not diverted merely because the price is not paid. If this be so, the vendor then has only a right to look to the thing as a security for the payment of the price. He is under *our Code* in no sense the owner of the the thing which he has sold. Now, although in strict law, we may distinguish between the dissolving condition implied for the non-payment of the price, by our law, and the vendor's right of preference upon the proceeds of the thing sold, yet we think that it was not the intention of the lawgiver, in the provisions of the Code, in reference to privileges, to draw this distinction, and that he included both terms under the general head of privilege in prescribing the manner in which the vendor could secure his rights.

For the Articles of the Code prescribing the manner in which the seller may obtain a dissolution of the sale, give a right to demand the rescission of the sale of movables, as well as immovables. C. C. 2542. And under the title of privileges, under the head " of the privilege of the vendor of movable effects" after providing in what manner the vendor may claim a preference on the price it declares, in Art. 3196, that if the sale was not made on a credit, the seller may even claim back the things in kind, which are thus sold, as long as they are in the possession of the purchaser, and prevent the re-sale of them, provided the claim for restitution be made within eight days of the delivery, at farthest, and that the identity of the objects be established.

In the next two Arts. the Code treats of the same right in reference to goods in bales and packages, and household furniture, &c. Now it can hardly be supposed, that the compilers of the Code would have devoted three out of five Arts., under the head of vendor's privilege on movables, to the right of vendor to reclaim the goods sold for the non-payment of the price, unless they had considered that right a privilege also, and the maxim *qui dicit de uno negat de alterio* is without application to the question before us. If it were a privilege in the matter of movables, it could not be the less so in the matters of immovables and slaves. Hence, when the lawgiver declared that the vendor of an immovable, and slave, preserved his privilege only by recording *his act of sale*, (C. C. 3238,) and that no notarial act, concerning immovable property, shall have any effect *against third parties*, until the same shall have been recorded, (Act 1810,) and when he further declared, that mortgages are allowed to prejudice third persons, *only*, when they are recorded, (C. C. 3315,) in other words, that mortgages shall have effect against third parties, when they are recorded, it is no forced interpretation to hold that the subsequent *bona fide* vendee or mortgagee, who has recorded his title, will be protected against a former vendor or mortgagee, as to the unrecorded title, as well as to incumbrances, which have not been made public upon the mortgage records. For the party who has dealt with the debtor, *in ignorance* of the rights of another, is to be protected. C. C. 3315. This view is strengthened by the following considerations:

We may assume that this was the contemporaneous construction of the legislation upon the subject, for we cannot but suppose, that innumerable actions of

this kind would have been instituted, if it had been supposed they could be sustained, for the books are full of cases where the parties have failed (for want of inscription,) in their actions, to recover a privilege for the price upon the thing sold, and this is the first case brought before this tribunal, in which an attempt has been made to defeat a recorded mortgage, or the title of a *bona fide* purchaser, without notice, by an act of sale not recorded, although it has been for a long time settled, that a suit to recover the price, did not prevent a party from turning to the action of rescission.  15 L. R. 79.

We cannot suppose, that the Legislature would have guarded with so much care the inscription of mortgages and privileges, unless they were to be of some avail when so recorded.  For example, the recorder of mortgages must give security, 3357, 3358 and by Art. 3328, it is made the duty of "every notary, who shall pass an act of sale, mortgage, or donation of an immovable, or slave, to obtain from the office of mortgages, of the place where the immovable is situated, or, where the seller, debtor or donor has his domicil, if it be a slave, a certificate declaring the privileges or mortgages, which may be inscribed on the object of the contract, and to mention them in this act, under the penalty of damages towards the party who may suffer by his neglect in that respect."  If any former vendor who holds with unrecorded act of sale, has a right to rescind the sale, the production of the certificate of mortgages so carefully enforced, is of no avail to the purchaser, and the Art. itself, and all the abstruse learning and provisions of law, on the subject of the inscriptions and erasures of mortgages, are absurd and useless.

It may be argued, *a contrario*, from Arts. 3360, 3362, 3366, that the third possessor is only bound to surrender the property when the mortgage has been recorded.  And the Act of 1839, p. 194, section 2, in providing that certain notarial acts, if recorded within twenty days, should not be affected by subsequent acts, although recorded first, clearly shows that the Legislature at that time thought that a purchaser or mortgagee, acquired rights against all third persons by recording their acts.

If Arts. 3238, 3314 and the Acts of 1810 and 1813, do not protect the *bona fide* vendee or mortgagee, against the unrecorded claims of any former vendor, then the Art. 3194 and 3196 in regard to movables, cannot protect the vendee of a movable against the claim of any former vendor who may have sold on credit, for these Arts. do not so much expressly limit Art. 2539, as do the Arts. and Acts cited in regard to the immovables.  A doctrine which would fill our business community with alarm.

The prescription in the action of revendication of slaves, as against a possessor by just title, and in good faith, is five years.  The introduction of the principle contended for would leave the property subject to a rescission and revendication for five, and perhaps ten years after the maturity of or an unsuccessful attempt to recover the price, a result wholly incompatible with that assurance of title intended by the provisions of the Code in regard to prescription.  C. C. 2218, 3507, 3508.

The policy of our law has always been to place property directly in commerce, and protect the possessor in good faith in his title and property.  Hence the provisions relative to substitution, *fidei commissa*, prescription, partition, &c. The construction contended for is in direct conflict with this policy, as well as the design of the law-giver to protect creditors and others dealing with one apparently owner.

The sanctioning of the principles contended for would render insecure the most important interests, and would, as already observed, fill with alarm the holders of mortgage securities and the owners of real estate, slaves and movables. Without the immediate interposition of the Legislature, no one would feel secure. The recorded title, the probate sale, the certificate of mortgages, would be as so much waste paper, and another element of suspicion would be added to our already clouded titles. The holder of personal property would not be in any manner more secure, for any person who had possessed the property within five years previously, could, under the formidable maxim, *nemo plus juris in alium transfere potest quam ipse habet*, demand the thing itself and leave him unprotected by his prescriptions, delivery and payment of price to his immediate vendor.

It would be inconvenient, and often impossible, to obtain in our country the quittances for the price of movables and slaves for five or ten years previous to any sale which might be made and even in regard to immovables with our improvident and migratory population, it could not be expected.

If it is the folly of the subsequent vendee or mortgagee, to take a title or mortgage without causing the quittances of all former owners for five, ten or fifteen years to be produced, and if no one may convey a greater right than he has, then the whole registry law is founded on a mistake and fallacy, for it would be equally the folly of any subseqent purchaser or mortgage creditor, that he did not assure himself that the property had not been previously sold, or mortgaged before he purchased, for no one can convey to another a greater right than he has, and the possessor had no power to sell or mortgage a second time.

In reply to the argument that the French jurists are unanimous now in the construction which they placed upon the Code, I may be permitted to observe that we have the two statutes of 1810 and 1813, besides many provisions of our Code different from the Napoleon Code. Moreover, the present construction arrived at under that Code, was not adopted, as Duranton informs us, without a struggle there. The great danger is that if we undertake to follow the interpretations of the French commentators, as sure guides, because the Napoleon Code originated with them, we shall overlook the distinctive features of our own legislation so different in its tendencies, and find ourselves involved in inconsistencies and often standing directly in the way of the interests and advancement of our own people, whose habits are in so many respects the opposite of those of the French nation.

As already observed, it is not pretended that there were in force in France, Acts corresponding with our Acts of 1810 and 1813, and the Arts. of our Code are in my opinion essentially different from those of the Napoleon Code. In the Napoleon Code, I find no Arts. corresponding with 3314 and 3315, conferring upon the mortgagee with a recorded title the right of affecting the property as against third persons who have not had their securities recorded. Neither are Arts. 3196, 3197, 3198, classing the dissolving condition as to movables with privileges, in the Napoleon Code.

Although the Code has no where said in express terms " that registry is essential to the preservation of the dissolving condition " the law has classed this with privileges, and declared that they cannot exist without registry, and moreover declared, that it is essential to the validity of a notarial act to affect slaves as against third persons that it should be recorded, (Act 1810,) that

sales under private signature affect third persons only from the day of their registry, (2242, 2417,) and it has impliedly declared that mortgages may affect third persons when they are recorded. C. C. 3319.

Again, it is said that if the Act of 1813 makes the sale absolutely void, then the vendee and mortgagee take nothing. This is fully answered both by Art. 2417 of the Code, and the same Act, by which it appears that the defect of registry shall only be pleaded between the parties to the Act. Hence, when this argument is resorted to, the reply is, "you put the vendee in possession as owner; we trusted him on the faith of your act, and we have recorded our mortgage, which if it prejudices you is your own fault. You put it in the power of the vendee to deceive us and the rest of the community. If you say now you did not sell, your assertion is repelled by the act which you have executed but which you have either dishonestly or negligently withheld from record and publicity."

In conclusion, I may observe that I consider the construction which I have placed upon the Articles of the Civil Code and Acts of 1810 and 1813, within the letter of their provisions. But were it not within the exact and precise letter of any given phrase, but within the general scope of the whole, it would not be the less our duty to obey the known will of the lawgiver. For if the mind from an examination of the whole legislation on a given subject has comprehended its spirit and thus ascertained the legislative will, it has learned the *law* on that subject, and any wandering after words and phrases in order to find some other interpretation, or a refusal to obey because the letter of the law cannot be marshalled to embrace a particular word which is still within its general scope, is itself a violation of law. In the case of *Holmes* v. *Wiltz*, it was held that an interpretation of a statute which must lead to consequences both mischievous and absurd is inadmissible if the statute be susceptible of another interpretation whereby such consequences may be avoided; that the legislative intention must be honestly sought after and faithfully executed, if not in conflict with a paramount law, and that in cases like that, the court was authorized to search for the meaning not merely in the words of the statute itself, but in the subject-matter, in the history of the legislation thereupon, the purpose of the new law, the reason of its enactment and the evil it sought to remedy.

As *B. Toledano & Taylor* dealt with *P. Bloodworth* in *ignorance* of the plaintiffs rights (3315, C. C.) and as they have recorded their act and mortgage I think they are protected by Art. 3314 of the Civil Code.