## No. 8727.

### SUCCESSION OF JOHN BURNSIDE.

The cardinal rule in the interpretation of wills is to ascertain the intention of the testator, and to give effect to it when ascertained.

A legacy of "the residue of my property of every description" is an universal legacy. Descriptive words of the different kinds of property composing that residue are not words of limitation, but of illustration.

An universal legacy carries the totality of the property owned by the testator at the time of his death, and includes property acquired after the date of the will as well as that owned at that date, and this is true even when the character or kind of property has been wholly changed in the interim between the making of the will and the death.

Particular legacies which have lapsed by the death of the legatee before the testator, or from other inability of the legatee to take them, fall into the residuum, and go to the universal legatee and not to the heir.

The universal legatee takes everything that has not been validly given away.

Succ. Valentine, 12 Ann. 286, and Lawson's Case, Ibid. 603, overruled.

APPEAL from the Civil District Court for the Parish of Orleans; Monroe, J. ..

*J. A. Campbell* and *T. Gilmore & Sons* for the Executor and Legatee:

The olographic will of John Burnside, written in April, 1857, and established after his death in 1881, was executed, that he might "dispose of all his worldly estate," by that, "his last will and testament," after his death. He had no living ascendants nor descendants, nor kindred, to be objects of care.

His bequests consist of $312,000 of money, and a square of land, distributed among twenty-six individuals or charitable institutions, in particular legacies to partners, employees, friends, children of friends and charities. The 15th article designates a sole executor "to carry the will into full execution" as his last will.

'The residue of his property, of every description," he bequeaths to Oliver Beirne, his late partner, as a token of sincere regard for uniform kindness, and services rendered to him in early life, subject to legal charges. The bequests made he directs to be paid at the end of twelve months after his death.

The will is, as he repeatedly declares in it to be intended, "his last will and testament." None other has been found. He makes it with a remembrance of the uncertainty of life, and fulfils his declaration that it makes a valid, full and final arrangement of his property, to take effect after his death. C. C. 1606, 1607-8-9-10.

The announcements of the testator that this was his olographic will, signed and dated at the commencement of the will; that he was of sound body and mind; that he was mindful of the uncertainty of life, and of his purpose to dispose of all of his worldly estate by that his last will and testament, furnish authentic evidence of his testamentary intentions. The methodical and exact arrangement of the particular legacies; the appointment of a sole executor to carry this, his last will, into full execution, without a bond; the bequest to him "of the residue of his property of every description," with an expression of the motive and the final direction to pay the bequests at the end of twelve months, demonstrate that he fully appreciated and comprehended accurately all that he had undertaken to perform: the disposition of his entire succession.

The words already quoted, "all my worldly estate," the "residue of my property of every description," imply that the testator had a conception, an idea that he was the owner of an estate, of an aggregate of property of a various description, a sum of separate values which, in the ordinary course of his own life, would change their form or substance without material diminution or deterioration, and whatever substitutions or alterations, additions or subtractions, would take place, there would exist at his death, independently of all these, a worldly estate sufficient to answer all the particular charges at the end of twelve months after his demise, and of that worldly estate there would be a residue which would express his sincere regard for a friend and his early benefactor.

The word estate is frequently employed in the Code. Its signification is property of every description. C. C. 448. It is frequently used as the equivalent of the word succession. C. C. 906, 921, 923, 1660; Shane vs. Withers, 8 La. 489.

In a number of instances, it implies an aggregate of property consisting of various objects whose separate items and values constitute a totality. C. C. 472, 486, 543, 47, 52, 73, 223, 874, 2436.

The will of John Burnside, containing as it does, a disposition of all his worldly estate, and providing a legatee to take all of that estate not included in particular, defined pecuniary legacies or a parcel of land, and this legatee, acquiring, by the terms of the will, property of every description, is a universal legatee under the Articles of the Code, and according to the jurisprudence of this Court. C. C. 1606, 1610; Shane vs. Withers, 8 La. 489; King vs. Woodhull, 3d Ed. Ch. 79; Succession of Fiske, 3 An. 705; Sitgreaves vs. Brewer, 15 Ch. D. 594; Preston vs. Clarke, 2 An. 580; Banks vs. Phelen, 4 Barb. 94; Shaw vs. York, 5 An. 146; Archer vs. Deneole, 1 Peters, 588; Succession of Mylne, 2 Rob. 383; Given vs. Hilton, 5 Otto, 591; Compton vs. Prescott, 12 Rob. 57; Smyth vs. Smith, 8 Ch. D. 561; King vs. George, 4 Ch. D. 627; Prevost vs. Martel, 10 Rob. 513; S. C. on appeal, 5 Ch. D.

627; Succession of Foucher, 18 An. 409; 2 Redfield on Wills, 117; 1 Jarman on Wills, 700 ; 2 Williams on Ex. 1251.

The will of John Burnside is not affected by the existence of any heirs " to whom a portion of the succession is reserved by law;" none such exist. It undertakes to make a full disposition of the entire succession. *No disposition therein was illegal or void, ab initio.* The only fact to affect its execution, as he made it, is, that before the death of the testator some of them had died. The provision of the Code is, that these dispositions are without effect. C. C. 1697, 1703, 1704. But the will has provided that whatever property the testator has, shall go to the person instituted by the testator as the residuary legatee. The authorities cited from the jurisprudence of this State, the authority of the commentators on the corresponding Articles of the French Code, and the torrent of English and American authorities, sustain the proposition that this legatee takes the lapsed legacy. 17 Pothier Coutumes D'Orleans, p. 491, No. 142; 1 New Denizart, p. 38, § 32; Merlin Accroissement, II, 4; 5 Toullier, No. 2160; 4 Troplong, D. & T. 2160; 21 Demolombe, p. 476, Nos. 542, 543, 544; Coin de Lisle, D. & T. No. 2160, § 7; 13 Laurent, 558, 570; 7 Aubry and Rau, p. 461, No. 714.

The intervenors make objections to the title of Oliver Beirne, that this last will and testament did not operate upon any worldly estate, save such as he then owned and possessed. But this is to contradict the plain declarations of the testator, and to annul the cardinal rule of interpretation to discover the intentions from the terms of the will. C. C. 1712; Theall vs. Theall, 7 La. 226.

That there is a limitation contained in the 17th section of the will by a specification of certain articles of property. The authorities are full in their refutation of such an interpretation. O. Toole vs. Brown, 3 Ellis and B. p. 572; 2 Redfield on Wills, 117; Dobson vs. Bowness, 5 L. R. Eq., 404; 5 Allen, 466; Dean vs Gibson, 3 L. R. Eq. 713; 9 Paige, 94; Sitgreaves vs. Brewer, 15 Ch. D. 590.

That the donation of $312,000 in particular legacies to twenty-six different legatees, separated that sum finally from the succession, and effectually precluded Oliver Beirne from any portion of that sum. This is not true. The legacy did not vest as property in any one of those twenty-six legatees, and no right accrued to any one of them, unless he were alive at the death of the testator. By the terms of the Code, the bequest was without effect, and that the testator knew and provided for. The residue of property of every description was bequeathed to Oliver Beirne, subject to the charges on his succession. Debts and incidental expenses, and the payment of bequests at the end of twelve months after his demise. This was to be the consummation of all of his dispositions of all of his worldly estate. The Article 1703 of the Code provides for the case of a rejection by an instituted heir or legatee. No rejection has taken place. Also, where either is incapable of receiving it. The incapacity spoken of is a legal disqualification, such as bequests to slaves, adulterine children or concubines. The rule of the Roman Law was, that caducity embraced all of those legacies, which being originally capable, failed *"aliqua ex causa non ceperit."* The cases of original incapacity were unavailable, and were *pro non scriptis.*

The Article 1709 defines three cases: 1st, the case where a person dies intestate as to any portion of his estate, where he has not disposed of it by his will. This case has not arisen, for the will was made to dispose of all of his estate, and the words are adequate to convey it. The second case in Art. 1709 is, that when the heir or legatee is incapable to take the legacy. In this case there is intestacy. Cases of the kind have been decided in the courts of Louisiana—cases of legacies to slaves or incapable persons. Turner vs. Smith, 12 An. 417; Deshotels vs. Soileau, 14 An. 745.

The property in these cases was turned over to the legitimate heirs. The Court in both cases decided that the testator had expressed his entire testamentary purposes by those bequests; that he made no bequest over, in respect to these, and the law had not annexed to the bequests any condition in favor of any other person who was named in those particular wills.

The case here is one where every section of the will was valid and operative in respect to the persons and in respect to the property. There was no incapacity nor illegality.

An event occurred in the order of nature, intelligible and within the prevision of testator. He knew the import of his words; and the words he employed were sufficient to carry to Oliver Beirne all of the succession not needed to pay debts and expenses incident to succession and to all living legatees. He was charged to pay these and no more.

The appointment of attorneys to represent absent heirs, where no absent heirs are shown to exist, or where, if they do exist, they are excluded from participation in the succession by the will of the testator, is a nullity. C. C. 1661, 1210; Mix vs. Mix, 15 L. 66; Rabouan vs. Rabouan, 12 L. 89; Lacy vs. Newport, 3 An. 226; Linton vs. Moore, 4 L. 434; Succession of Harris, 29 An. 746; Addison vs. Saving's Bank, 15 L. 528.

The intervenors have, in the case shown by the record, no standing to call in question the disposition in favor of Oliver Beirne.

*Robert Mott, B. F. Jonas* and *Henry B. Kelly,* Attorneys of Absent Heirs:

The law presumes every person to be acquainted with its rules of interpretation, and consequently to use expressions in their legal sense. The language of the courts, when they speak of the intention of the testator as the governing principle, must always be understood with this limitation, that here, as in other instances, the judges submit to be bound by precedents and authorities in point, and endeavor to collect the intention upon grounds of a judicial nature, as distinguished from arbitrary occasional conjecture. The Courts must proceed on known principles and established rules; the rules of construction established by statute are binding upon the Courts. Jarman on Wills (5th Am. ed. by Bigelow), vol. 1, p. 838; Allen's Ex'r. vs. Allen, 18 How. 391; Clayton vs. Clayton, 3 Binney, 481; Mudge vs. Blight, Cowp. 355; Von Kleck vs. Reformed Dutch Church, 6 Paige, 600; Puinn vs. Hardenbrook, 54 N. Y. 85; Lynes vs. Townsend, 33 N. Y. 558; Doe vs. Frelkinson, 2 T. R. 209; Doe vs. Dring, 2 Mann. and G. 448; An Act for the amendment of of the laws with respect to Wills, 1 Vic. ch. 27; (Appendix to Jarman on Wills, vol. 2, p. 885). General Rules for the Interpretation of Legacies, C. C. Arts. 1712, 1722.

In England, prior to 1 Vic. ch. 26, the rule of construction of wills recognized and followed by the courts, was, that as to devises of real estate, the will spoke from its date, and that as to bequests of personalty, it spoke from the time of the death of the testator. By Section 24 of the Act of 1 Vic. ch. 26, a statutory rule of interpretation was established, by which every will is required to "be construed with reference to the real estate and to the personal estate comprised in it, as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will." Jarman on Wills, vol. 1, p. 326.

The rules for the construction of wills, established by legislative authority in Louisiana, are as binding on the courts of the State, as rules of interpretation established by Act of Parliament are upon the Courts of England. And those rules differ radically from the English rule, both as it existed anterior to 1 Vic. ch. 26, and as modified by that Act; and from the rule of testamentary interpretation followed by the courts of other States of the Union, where the old English rule was recognized, and has been modified by statutes similar to 1 Vic. ch. 26.

In Louisiana the rule of testamentary construction established by statute is, that the will speaks from the death of the testator, only when it is "couched in the future tense;" and that when it "couched in terms, present and past," or in terms "which express no time, neither past or present," it speaks only from its date. C. C. 1720, 1721, 1722.

Under the system of the Code Napoleon, followed in that respect by the Civil Code of Louisiana, every testamentary disposition is denominated a legacy. Demolombe, Don. et Test. vol. 4, No. 525. The general rules for the interpretation of legacies of our Civil Code, Arts. 1712–1723, and forming a distinct section of the Code, are not to be found in the Code

Napoleon. No such rules for the interpretation of wills were ever established by statute in France, the only rules to be found in the French Code being, not general rules for the interpretation of wills, but particular for the interpretation of specific legacies of a certain kind, as Arts. 1019 and 1023, C. N., corresponding with Arts. C. C. 1637 and 1641 which are not included among the General Rules established by our Codes, but are to be found under the head of "Particular Legacies."

The general rules of interpretation of our Code, omitted *ex industria*, from the Code Napoleon, are of very ancient origin. They are derived from the "Règles Générales pour l'interpretation des legs" of Pothier, who drew them from the Corpus Juris Civilis. They are applicable to the interpretation of testamentary dispositions of every character, and are not to be limited in their application, as was erroneously assumed in Shane vs. Whithers, 8 L. 489, exclusively to special legacies or to dispositions made by a testator of some determinate portion of his estate, designated in genus or species. C. C. 1721, (1714), 1720, (1713), 1722, (1715). Règles Générales pour l'interpretation de Legs. Pothier Traité des Testaments, Vol. 7, p. 410, Règles XXX, XXIX, XXXII ; Pothier, Pand. Vol. XI, p. 534, Trigesima Regula ; Id. Ib. p. 524, Trigesima Nona Regula; Id. Ib. p. 538, Trigesima Secunda Regula; Duranton, T. 9, No. 182, Coin Delisle, No. 9 ; Sirey Code, An. 1003, No. 2 : Pothier, Pand. XI, p. 538; Marcadé, Vol. 4, p. 67; Mourlon, Vol. 2, p. 418; Austin's Jurisprudence, pp. 448, 171; Pothier, Pand. XII, p. 484; C. C. 1691 (1684) ; Pothier, Testaments, Vol. 7, pp. 375, 382 ; 2 Williams on Ex'rs. p. 742 ; 1 Jarman on Wills, pp. 330, 751, 754; Timewell vs. Perkins, 2 Atk. 203; Pothier, Test. Vol. 7, p. 404; Pothier, Pand. XI, p. 590; Succession of Valentine, 12 An. 287 ; Lawson vs. Lawson, 12 An. 603 ; Lebeau vs. Trudeau, 10 An. 165 ; Succession of Foucher, 18 An. 1409.

So, with regard to the rules of interpretation of wills in respect of lapsed legacies. The rules relating thereto, established by Statute in Louisiana, differ materially from the rules in *pari materia* established in France, and radically from those established in England and the States of the Union, which have adopted the English legislation and jurisprudence on the subject.

By the 25th Section of 1 Vic. ch. 26, it was enacted "that unless a contrary intention shall appear by the will, such real estate or interest therein as shall be comprised, or intended to be comprised, in any devise in such will contained, which shall fail or be void by reason of the death of the devisee in the lifetime of the testator, or by reason of such devise, being contrary to law, or otherwise incapable of taking effect, shall be included in the residuary devise (if any) contained in such will."

The right of a legatee to take a legacy to another which has lapsed is termed, in the civil law, the right of accretion. The statutory enactments in Louisiana, regulating that right, differ radically from the English Statute referred to, which embodies the rule that prevails generally, where the English system of legislation and jurisprudence is followed.

By the statute law of Louisiana it was long since declared, that the right of accretion shall no longer subsist in this State, except in two cases, viz: 1, Where a legacy is made conjointly, to two or more persons, by one and the same disposition, without the testator's having asssigned the parts of the co-legatees in the thing bequeathed; and, 2, When a thing not susceptible of being divided without deterioration has been given by the same act to several persons; and the statute law declares, that except in the two cases stated, every portion of the succession remaining undisposed of, either because the testator has not bequeathed it, or because the heir or legatee has not been able or has not been willing to accept it, shall devolve on the legitimate heirs. The law thus establishes not only a rule of interpretation, but a rule of property, from which the Court is not at liberty to depart. C. C. Arts. 1706, 1707, 1708, 1709; C. N. 1044, 1045.

Under the old Roman law, and that of the Pays de Droit Écrit, derived from it, there could be no valid will which did not institute an heir, and dispose of the entire estate. Under the system which prevails in Louisiana, derived from the Droit Coutumier, it is otherwise.

Under that system a person may dispose of his estate by will entirely, or he may do so partially, and die *partim testatus et partim intestatus.*

There is no presumption of law in Louisiana that a person making a will intends thereby to dispose of the entire estate of which he may die possessed. On the contrary, the law only presumes such intention where the dispositions of the will are " couched in the future tense," and where they are couched in terms of the past and present, or no time is mentioned, the presumption of the law is, that the testator intends to dispose only of property which he has at the time of making the will, or of so much thereof as is actually disposed of by the will. Dig. Lib. 1, XVII; *De diversis regulis juris antiquæ,* Nos. 7, 62 ; Mourlon, Vol. 2, p. 419, Nos. 824, 825, 826, 828 ; Marcadé, Vol. 4, p. 64, No. 92; Demolombe, Donat. et Test Vol. 4, Nos. 8, 11.

The will of John Burnside, propounded and probated herein, contains no testamentary dispositions whatsoever couched in the future tense, further than must be expressed or implied in every last will and testament; which must necessarily refer to the time of the death of the testator as time when it is to take effect, and contemplate and provide for its execution thereafter. With this reservation, all the testamentary dispositions of the will either express no time, or are couched in terms of the past and present. The residuary clause is couched in terms of the present, and does not constitute Oliver Beirne universal legatee, or legatee of the residuum of the entire estate of which the testator shall die possessed; but does constitute him legatee of the residuum of the estate of the testator, at the time of the making of the will, remaining after deducting therefrom the sum of the legacies bequeathed to others by prior clauses of the will.

As to the lapsed legacies, Beirne is precluded from taking them by the textual provisions the statute law of Louisiana, and the settled jurisprudence of the State. The values compromised in such legacies pass *ab intestato* to the legitimate heirs of decedent, or in default of such, belong to the State of Louisiana. C. C. 1605 (1598), 1606 (1599), 1612 (1604), 1625 (1618) ; Code Napoleon, Art. 1003 ; Mourlon, vol. 2, p. 415 ; Sirey, Code An. Art. 1003 ; Pothier, Testaments, Ch. 6, §§ 4 and 1, p. 298 ; C. C. 1706, 1707, 1708, 1709 ; Code of 1808, p. 250, Arts. 194, 195, 196, 197 ; Code Napoleon, Arts. 1044, 1045 ; Compton vs. Compton, 12 R. 56 ; Turner vs. Smith, 12 An. 317 ; Lewis vs. Williams, 14 An. 629 ; Deshotels vs. Soileau, 14 An. 745 ; Succession of Dougart, 30 An. 268 ; Laurent, Principes de Droit Français, vol. 24, p. 316, No. 207 ; C. C. 1691 (1684), 1675 (1688) ; Pothier, Testaments, vol. 7, pp. 375, 382 ; 2 Williams on Executors, 742 ; 1 Jarman on Wills, 330, 751, 754 ; In re Gibson, L. R. 2 Eq. 669 ; Pothier, Pandects, xi, p. 538 ; Dig. L. xxxiv, tit. 11, 1, 7, *de verbo* Meum ; Timewell vs. Perkins. 2 Atk. 203; Pothier, Testaments, vol. 7, p. 404, Règle, xi ; Pothier, Pandects, xi, p. 590 ; Newman vs. Newman, 26 Beav. 220 ; Barnaby vs. Tassell, L. R. 11 Eq. 363 ; Twining vs. Powell, 2 Coll. 266 ; 2 Mourlon, No. 818 ; 2 Williams on Executors, p. 890 ; 2 Mourlon, p. 449.

It is conceded that should it be finally determined that the entire estate of the decedent has been validly and effectually disposed of by the will, and that the estate is, as to no part of it, one *ab intestato,* and that, therefore, there can be no absent heirs, whose rights require protection, it will be proper to vacate the appointment of attorneys of absent heirs. The appointment was one proper to be made under the circumstances. The court below upon this application of the attorneys of absent heirs to have the will judicially construed, has decided that the succession is one *ab intestato,* at least to the extent of one hundred and thirty-eight thousand dollars. Until the final determination of the cause in this court, it is proper that the appointment of attorneys of absent heirs should be maintained, to the end, that the questions involved in the judicial construction of the will may be properly presented to this Court for consideration and determination, and that the rights asserted for the heirs-at-law of the decedent, or in default of such for the State, may, in the event of their being recognized to any extent by the Court, be duly protected according to law. Rabouan vs. Rabouan, 12 L. 73 ; Addison vs. Bank, 15 L. 528 ; Lacey

vs. Newport, 3 An. 227; Succession of Harris, 29 An. 746; Succession of Mayer, 12 R. 413; C. C. 1205, 1211; Acts. 1871, p. 200; C. C. 1156, 1270; Dupré vs. Reggio, 6 L. 654; Mercier vs. Sherlen, 5 L. 474.

*Thomas Hunton* and *John McEnery*, Special Counsel for the State of Louisiana.

The opinion of the Court was delivered by

MANNING, J.   John Burnside died on June 29, 1881.   Shortly thereafter his will was admitted to probate and was ordered to be executed. It begins thus :

NEW ORLEANS, April 28th, 1857.

I, John Burnside, being of sound mind and body, but mindful of the uncertainty of life, do by this my last Will and Testament, dispose of all my worldly estate, as follows :

Eighteen numbered clauses then follow, the first fifteen of which contain legacies to several persons and charitable institutions.   The last three are in these words :

16.   I do nominate and appoint Oliver Beirne, my late partner in trade, my sole executor to carry this, my last will, into full execution ; no security shall be exacted from said executor, Oliver Beirne, for the faithful discharge of the duties imposed on him by this, my last will and testament.

17.   The residue of my property of every description—say stock in trade, promissory notes, accounts, my interest in the firm of J. Burnside & Co., stocks, etc., etc., etc., I bequeath to my executor, Oliver Beirne, subject to the payment of all my just and lawful debts, and the expenses incidental to my succession, as a token of my sincere regard for his uniform kindness and services rendered to me in early life.

18.   At the end of twelve months after my demise, my executor, Oliver Beirne, will pay the bequests herein made, or as soon thereafter as possible.

JOHN BURNSIDE.

NEW ORLEANS, April 28, 1857.

Oliver Beirne qualified as executor, and accepted the succession unconditionally.   The Judge appointed Messrs. B. F. Jonas and Robert Mott attorneys of absent heirs, and a rule was taken afterwards to vacate the appointment.

Interventions were filed on the part of Robert B. Wilson, claiming to be a nephew and heir of the deceased, which seems to have been abandoned—by the attorneys of absent heirs on the part of such heirs as there might be, for whom it may concern, none being mentioned except

the claimant Wilson—and by special attorneys for the State, all of which aver that Oliver Beirne can take under the will only the residuum of such property as the testator owned at the time of making his will, and that as to all property acquired by him subsequent thereto he died intestate, and such property is inherited by his heirs, or in default of heirs escheats to the State.

Legacies amounting to $138,000 have lapsed by the death of the legatees before the death of the testator, and it is contended on the one hand that these legacies enure to the benefit of the universal legatee, and on the other, to the heirs and in default of heirs, the State.

Mr. Burnside was never married. If any relations survive him, they are distant collaterals. At the time of making his will he owned but one piece of real estate, bequeathed to Nelson McStea therein, which he sold many years before his death. At his death the bulk of his property was real estate, consisting of a princely domain of nine sugar plantations and a costly residence and grounds in this city. During the larger part of a long and busy life he had been in trade. His whole fortune at the time of making the will was invested in his dry goods business, and notes, accounts, stocks and such like, and amounted then to two million dollars. His partner Mr. McStea estimates it at that sum, much more he thinks than Mr. Burnside was worth when he died. The inventories of his estate aggregate within a fraction of eleven hundred thousand dollars.

The cardinal rule for the interpretation of wills is to ascertain the intention of the testator, and it is a rule of universal jurisprudence. It has been called 'the law' of the instrument, the 'sovereign guide' to those who seek the meaning of the will, 'the pole star' whither all must look who would find that meaning, and as Coin-Delisle has it, the trail which the Judge should follow in all its turns and windings. And yet, this rule has been so cumbered by glosses, so abraded and fettered by conditions superimposed by judicial construction, and so perverted by narrow pedantry, that in some courts it has come to mean, not that the intention of the testator must be sought, but whether he had expressed that intention in technical language. And this is exemplified by the candor of Lord Ellenborough when he said, "if I were asked my private opinion as to what the testator meant when he used the words 'effects,' I must suppose he meant to convey all his property for the maintenance of his family," but nevertheless he would not give effect to that meaning by his judgment.

The common law has a vocabulary, of which certain words are used to designate various kinds of estates, tenures, etc., the meaning of

which has been fixed for a time whereof the memory of man runneth not to the contrary. But to hold that a layman is supposed to know them, and do violence to his intention by construing them in their technical sense in an instrument, whereof the admitted rule of construction is to ascertain his intention, and thus to make them mean what he could not have meant and what the Judge does not believe he meant, is not to follow that rule which all admit is the sovereign guide for interpreting a will. It is not quite fifty years since this Court held, only after grave debate and not with assured hearty conviction, that "estate" and "succession" might be considered as synonymous when employed by a man making his own will! Shane vs. Withers, 8 La. 489.

There can be no doubt that John Burnside, when he wrote his will, intended to leave the residue of all property he then had to Oliver Beirne—in other words, he intended that Beirne should take his whole estate, subject only to the charges in the form of legacies. The will was made to avoid intestacy as to any part of his property, and had he died then, there could have been no question about the effect of the will.

Let us in the outset recognise the fact that the Code does not designate any words which must be employed to institute an heir, or to bequeath an universal legacy. It defines the latter simply as a testamentary disposition by which a testator gives to a person the whole of the property which he leaves at his decease. Rev. Civ. Code Art. 1606. It gives the name of legacy under a universal title to that disposition by which a testator bequeaths a fixed proportion of his estate or all of a particular kind of property, or a fixed proportion of a particular kind, Ibid, Art. 1612, and then groups all others under one head in the class of legacies under a particular title. Ibid, Art. 1625.

It is not claimed that the bequest to Beirne is a legacy under an universal title. It certainly is not a legacy of specific property like the square of ground to McStea, or of a fixed sum of money like those to Andrew Beirne and others—"a thing bequeathed," in the language of the next article of the Code; and it is argued as evident that it is not a universal legacy because it is not a disposition of his whole property.

The words of the Code are not sacramental. It is not needful that a testamentary bequest shall be couched in the identical language of the Code, and if it is essential to constitute a universal legatee that all shall be given him without diminution, the only will by which such legatee could be named would be one which contained that disposition and no other.

Demolombe considers the question in two aspects, whether the legacies which precede the disposition of the residue are under a particular or universal title, (and we are concerned here only with the former)

and after stating the arguments of preceding commentators says, the particular legacies which have been first made, not being of fractional parts of the whole—*n'ayant pas fractioné l'universalité*—the legacy which follows will naturally embrace the entirety. 4 *Donations et Testaments*, Nos. 541–2. 3 Troplong Donations et Testaments, No. 1783.

The whole discussion of the French commentators upon this subject was before this Court in Compton vs. Prescott, 12 Rob. 56, and it was admitted there may be cases in which the legatee of the residue, or of the remainder of an estate, may claim as universal legatee, p. 66, and it was later expressly adjudicated in Suc. of Fisk, 3 Ann. 705, wherein the Court, quoting Toullier—if a testator first give a particular legacy, and then bequeath the surplus or residue of his estate to another, the latter will be an universal legatee—applies it as a rule of construction which controlled that case. It therefore follows that this is either an universal legacy, or it is a nondescript. When the Code divides all legacies into three classes, and a legacy is of such kind as to exclude it from two of them, it must be in the remaining class or not exist. But it would exist without classification. The testator's disposition is there, and effect must be given to it. It can be included in no other class but that of universal legacies.

This being ascertained, what is the effect of this legacy upon property acquired after making the will?

The language of the testator is of the broadest and most comprehensive kind. In the exordium of the will he announces his intention to dispose of *all* his worldly estate, and after making a number of legacies then bequeaths the residue of his property *of every description.* Nothing is undisposed of. All his worldly estate of every description was intended to be passed by the will. What ground in law is there to defeat that intention? How dare a court disregard that intention, if it be assuredly ascertained?

The whole of one's property—*l'universalité*—Rogron defines as a being or entity, distinct from and independent of the particular things of which it is composed, and therefore continues to exist although its constituent parts change. So Demolombe;—*l'universalité*, that is to say, this collective being which we call patrimony is susceptible of augmentation and diminution, and in its comprehensive meaning embraces all the property, movable and immovable, corporeal and incorporeal, known and unknown, present and future, of the testator. 4 *Donations et Testaments*, No. 531.

It could scarcely be doubted that all the property of a testator of every kind would pass by such sweeping language as a general rule,

but there are facts and circumstances peculiar to this case which it is said prevent its application.

The testator at his death had *none of the property in kind* he possessed when he made his will. Speaking in general terms, he owned nothing but personal property when he made his will, and he owned nothing but realty when he died. Besides, in bequeathing the residue of his property, it is said he limited it by enumerating what he intended to give as stocks, notes, etc.

Here is manifest that tendency to technical construction which destroys the vital essence of a will, its life—the intention—in order to give undue effect to words of secondary importance. The testator's estate then consisted of the kinds of property enumerated, and nothing else. He meant to give all—said so—and added words descriptive of what all was composed of then. The word " say " used by him is not a word of limitation, but of illustration. To give that clause any other effect would be to make the notes, stocks, etc., the exclusive and special objects of the legacy, as if the testator had written, I bequeath my notes, stock, etc., and written nothing else. How can such meaning be extracted from expressions so significant as those used, for not content with saying that he disposed of the residue of his property, he adds, as if to shut out misconception, " of every description ? "

No argument can be drawn from the pecuniary result of the change in investments. It cannot be said the testator could not have intended to enrich Mr. Beirne to the extent he will be by this real estate. The property as it was when the testator selected him as the recipient of his bounty was worth more than it is now. The constituent parts of the universality have changed, but the collective being survives, and comprises all the worldly estate.

It is however contended that the law itself has imposed stringent rules which are imperative upon testators in making, and upon courts in interpreting wills, and that the terms in which dispositions must be couched are set, and have an inexorable meaning assigned them. Thus, a disposition couched in terms present and past does not extend to that which comes afterwards—if couched in the future tense, it refers to the time of the death of the testator—if the terms express no time, the disposition refers to the time of making the will. Rev. Civ. Code, Arts. 1720 ( 1713 ), 1721 ( 1714 ), 1722 ( 1715 ).

It would be a calamity if men were fettered by an unbending and inflexible formula for their expressions when doing an act which in our country is not infrequently done without assistance. And the funest consequences of such a rule would be vastly augmented by its discouragement of the wise practice of making wills in health and be-

fore approaching dissolution. Men would be deterred from making wills until the possibility of making more acquisitions no longer existed, if there was danger of wills operating only upon property possessed at the time of making them.

In Shane vs. Withers, 8 La. 497, this Court refused to consider those rules applicable to universal legacies, and in Louisiana vs. McDonough, 8 Ann. 252, it was said that the enactment of these articles is not restrictive of the rules for the interpretation of testaments found in the body of the Civil law, and that all alike are landmarks to the Judge who must in every case exercise his discretion in applying these articles, ever bearing in mind that the least circumstance is at times sufficient to prevent their application.

Whatever may be the effect of these articles they cannot be considered as impinging the fundamental rule, formulated by the Code under the same division of general rules for the interpretation of legacies, which enacts that the intention of the testator must principally be endeavoured to be ascertained. Rev. Civ. Code, Art. 1712 (1705). They must be read along with the recognition of that controlling principle, and be construed in subordination to it.

No greater force was ever given to those articles until in the Suc. of Valentine, 12 Ann. 286, and Lawson's case, Ibid. 603. The manner of treating the subject in those cases hardly implies that it received attention commensurate with its importance. A single sentence in the last case disposes of the matter contrary to the previously accepted view. We cannot follow those cases. They stand alone. They apply an inexorable rule which ought not to be applied unless an unambiguous law compels it, and the application is hostile to the spirit of our jurisprudence upon wills, and contrary to the express enactment of Art. 1712 (1705).

Our conclusion is that the will speaks as of the date of the death of the testator, and therefore carries the residue of all the property then owned by him, after deducting legacies.

One other question remains. To whom do the lapsed legacies fall?

The law of accretion had given rise to perplexing discussions among the French legists, in which the disputants had revelled until they were lost in a maze of subtleties and refinements. Our Code put a quietus upon the continuance of these discussions here by inserting a prohibition of the existence of the right of accretion, except in two cases—for the benefit of legatees when the legacy is conjoint; or where it is to two or more persons of the same thing, which cannot be divided without deterioration. Rev. Civ. Code, Arts. 1706 (1699), 1707 (1700), 1708 (1701). The next Article provides that except in these

cases, every portion of the succession undisposed of, either because the testator has not bequeathed it, or because the person to whom it is bequeathed has not been able or willing to accept it, shall devolve upon the legitimate heirs. Ibid, Art. 1709 (1702). Note the traduction of this Article in the Code of 1808, Art. 197, t. 11, b. 3.

It is confidently asserted these Articles are conclusive, but they have no application to the case before us, because it is not the right of accretion that is invoked by the universal legatee, but that other principle by which, as legatee of the whole, he is invested with the right to whatever is not legally and validly given away.

The identical question in the case at bar was presented to this Court in Prevost vs. Martel, 10 Rob. 512, where quoting the last Article at length and others pertinent to the matter in hand, the Court say : "it is clear therefore that there being no forced heir, the universal legatee is bound to discharge all the legacies, * * and that in case of their failure, he should be entitled to take them as a part of the succession," p. 518. The same principle was asserted in Major vs. Esnault, 7 Ann. 51, citing and approving the above case, and the whole subject was reviewed and reconsidered with the same result in Lebeau vs. Trudeau, 10 Ann. 164.

In Suc. of Foucher, 18 Ann. 409, it was said it was optional with the testratrix, having no forced heirs, to bequeath to or withhold from her relatives, and the construction must prevail that she desired the property to be distributed among her instituted heirs, and that the will should be read as if the name of the legatee of the lapsed legacy had never been in it.

These were followed by Hoover vs. York, 24 Ann. 375, where the Court say, the lapse of a particular legacy, by reason of the incapacity of the legatee, enured to the benefit of the universal legatees, and not to the collateral heirs, p. 380. In the Suc. of Dougart, 30 Ann. 268, the Court cited Hoover vs. York, and said, if these parties are universal legatees, they profit by the caducity of legacies to the exclusion of the heirs at law, p. 273, and this long line of uninterrupted and consistent ruling culminates in Suc. of Dupuy, 33 Ann. 277, where it was held that a legacy lapsing by the death of the legatee before the testator, enured to the benefit of the universal legatees, p. 282, thus exhibiting a remarkable consensus of opinion upon this particular question, this Court having seven times affirmed the principle, and on each occasion with a different personnel of this Bench—seven courts, each differently constituted from the others.

And why should it not be so ? The testator had formally and expressly disposed of all his estate, selecting a stranger in blood as the

object of his bounty, and thereby evincing his intention to put him in his own stead and place, to the exclusion of kindred. It is he that ought to take adempted legacies, they being a part, when caducity occurs, of the universality of the property.

" Ceci nous conduit à poser en principe certain et incontestable, comme nous l'avons déjà énoncé, que dans le silence du testament, le legs universel profite de la nullité ou la caducité des autres dispositions. C'est la conséquence nécessaire de la définition contenue dans notre article. Puisque le legs universel embrasse présentement ou éventuellement l'universalité des biens du défunt, il faut reconnaître que tout ce dont il n'a pas été valablement ou utilement disposé s'y trouve inévitablement compris. Ainsi deviennent forcément là propriété du légataire universel tous les objets que le testateur avait légués à des tiers qui, pour une cause ou pour une autre, ne peuvent pas les recueillir." 4 Saintespes-Lescot, No. 1314.

An ingenious argument is made against the principle of these decisions, and an attempt is made to break their force by the citation of Turner vs. Smith, 12 Ann. 417, wherein, it is said, the contrary rule is maintained, but the legacy there was under universal title, as was also the case in Lewis vs. Williams, 14 Ann. 625, and Deshotels vs. Soileau, Ibid. 745. Even if it were conceded that they sustain the principle contended for, they could not stand against the well considered opinions in the line of cases already cited, for it will be observed this particular question is disposed of in those three cases curtly and without a solitary reason therefor.

It is therefore ordered and decreed that the judgment of the lower court maintaining the interventions of the attorneys of absent heirs and of the State, and decreeing the heirs of John Burnside, or in default of heirs, the State of Louisiana to be entitled to the sums bequeathed to persons who died before the testator, is avoided and reversed, and that portion of the judgment which recognises Oliver Beirne as residuary legatee of the testator is amended, in this, that the said Oliver Beirne is now adjudged to be the universal legatee of John Burnside, and as such that he is entitled to the whole estate of said testator, after deducting therefrom the aggregate amount of the particular legacies which have not lapsed by the death of the legatees before the death of the testator, and he is also recognised as the executor of said testator. And it is further ordered that the dismissal of said Oliver Beirne's demand for the revocation of the order appointing attorneys for absent heirs is reversed, and his said demand is now maintained, the costs of appeal to be paid by the succession.

91

### CONCURRING OPINION.

FENNER, J.   It scarcely admits of dispute that, under the existing law of France, of England, and of the States of this Union, Oliver Beirne would, under the terms of the will in hand, take all that is claimed for him in this litigation.   The main contention of the learned counsel for absent heirs and for the State is, that the controversy is dominated by certain statutory provisions found in the Civil Code of Louisiana which, they maintain, lead inevitably to the exclusion of Beirne : 1st, from property acquired by the testator after the date of the will ; 2d, from the lapsed legacies.

According to their own view, it is a question purely and simply of Louisiana law—of the construction of Louisiana Statutes.

If we shall conclude that a construction of these statutes, founded on reason and sustained by jurisprudence, conforms the law of Louisiana, in these repects, to that of the enlightened countries and States first named, we shall at least feel safe that such conclusion will not presumably violate justice or policy.

The exceptional provisions of our law, chiefly relied on, are Articles 1722 and 1709 of the Civil Code.

1.   Article 1722, which is relied on as confining the legacy to Beirne to the property possessed by the testator at the date of the will, is one of several Articles denominated by the Code itself as " general rules for the interpretation of legacies."   Of these rules it was forcibly and truthfully said by Judge Rost, that they are mere " advices given to the Judge, landmarks they might be called, taking effect in the cases to which they apply, not so much *ratione imperii* as *imperio rationis.*" State vs. McDonough, 8 An. 252.

They are mere aids and guides in ascertaining the true intention of the testator, and are not entitled to that rigidity of domination, which seems to be claimed for them by counsel.

Article 1722, though excluded from the French Code, is a literal translation of the *trigesima secunda regula* of the Pandects.   11 Pothier's Pandects, p. 538.

It is there said, in substance, that this rule has no application to universal legacies, which, from their nature, are susceptible of augmentation or diminution.

The same doctrine has been expressly held by this Court.   Shane vs. Withers, 8 La. 489 ;  Shaw vs. York, 5 An. 146.

The contrary has never been expressly held in any case.

Succession of Valentine, 12 An. 286, which is relied upon as overruling those cases, does not mention them, and is expressly based

upon the " peculiar phraseology of the will," which evidently con-
templated the property *then* possessed, as appears from various clauses.
- Lawson vs. Lawson, 12 An. 604, is of still less force, as, though the
terms of the will are not given, it is stated that "the wife was a
particular and not a universal legatee," from which we infer that there
was no universal legatee.

Shane vs. Withers has never been overruled. Why should we now
overrule it? It merely applies a limitation to Art. 1722, which was
applied in the system from which it was taken, and it conforms our
law, to this extent, to the systems which the experience of the most
enlightened countries has adopted in the interpretation of testaments.
It enforces the manifest intention of the testator in the present case,
who made his will in expressed anticipation of death, and with the
desire of disposing of " all his wordly estate," and not to die intestate
as to any portion thereof.

The residue of " all his worldly estate," did not cease to be the resi-
due, because the constituent portions thereof changed.

· 2. The next important question, and perhaps the most difficult one
in the case, is, whether a disposition in a will by which, after first
bequeathing particular legacies only, the *residue* is bequeathed to a
person, is a universal legacy.

So far as this question is concerned, the provisions of our Code, affect-
ing it or bearing in any manner upon it, are identical with those of the
French Code.

The French authorities are, therefore, entitled to their legitimate
weight in its determination.

They are unanimous in support of the general proposition above
stated; and their arguments in its favor seem to me irresistible. 4
Demolombe, No. 541 ; Troplong, No. 1783; Coin Delisle, p. 451, No. 8;
5 Toullier, No. 513; 4 St. Espes-Lescot, No. 1685 ; 7 Aubry and Rau,
pp. 465–6.

· This is fully conceded by the learned Judge *a quo* in his able opinion,
and he professed his reluctance to adopt a theory differing from such
eminent authorities; but he arrives at the conclusion that " the juris-
prudence of Louisiana does not conform in regard to the point at issue
to the views expressed by these writers, and is much better founded
in reason and supported by logic."

I have carefully studied the cases in our reports on which he bases
this opinion.

Compton vs. Prescott, 12 Rob. 56, was a case where the residuary
bequest was preceded by a legacy under *universal title.*

Far from overruling, the opinion quotes, without dissent, the doc-

trine of the French jurists, " that if a testator, after making a particular legacy, gives the remainder of the estate to another legatee, the latter should be considered a universal one ; " and proceeds to difference the case in hand from that doctrine.   P. 66.

Turner vs. Smith, 12 An. 417 and Deshotels vs. Soileau, 14 An. 745, rest entirely upon the authority of the foregoing case, and give no reasons whatever.

Succession of Dougart, 30 An. 268, rests upon peculiar principles not involving the proposition under discussion.

In no case has this Court ever advanced the general proposition, that a residuary legacy, following only specific particular legacies, is not universal in its character.   The cases above quoted rest upon their own peculiar facts.   It is not pretended, even by the French authors, that the general doctrine is without exceptions.   On the contrary, after announcing the general principle, Coin Delisle says : " Cependant, les tribunaux n'ont pas toujours consideré comme un legs universel la disposition du restant des biens, après le paiement des autre legs.   Ils ont le pouvoir d'examiner si, dans la volonté du testateur, ces expressions ont eu pour objet de limiter le droit du légataire; et s'ils reconnaissent que telle est son intention, ils refusent au légataire *du restant,* l'accroissement qui résulterait de la nullité de certains legs particuliers, etc." P. 451, No. 8.   So says Marcadé on the subject : "Ce sont là, on le voit, des questions de fait, des appréciations des circonstances et d'intention, abandonnées à la sagesse des magistrats."

I am constrained to suppose that, in the cases referred to, the Court exercised this liberty, and did not intend to announce a general principle adverse to the French doctrine.   And, indeed, on examination of the particular facts presented in those cases, I see no reason to question their correctness.

On the other hand, I consider that Compton vs. Prescott impliedly recognizes the French doctrine, and in two other cases, this Court has expressly recognized it.   Succession of Fisk, 3 An. 705 ; Majors vs. Esnault, 7 An. 51.

For these reasons, I cannot concur in the opinion of the District Judge that our jurisprudence has established an interpretation of our Code adverse to that of the French commentators and courts, still less, one more conformable to reason and logic.

If the general principle is applicable in any case, it is applicable to the will in this.

3.   The next and final question is, whether legacies which lapse enure to the benefit of the universal legatee or of the legal heirs.

The claim of the universal legatee is sustained by a course of decision

too inveterate to admit of question. Prevost vs. Martel, 10 Rob. 513; Majors vs. Esnault, 7 An. 51; Lebeau vs. Trudeau, 10 An. 165; Succession of Foucher, 18 An. 409; Hoover vs. York, 24 An. 375; Succession of Dougart, 30 An. 273.

Taken in connection with the foregoing propositions, this disposes of the case.

Articles 1706 and 1709 of the Code have no application, because they refer only to *accretion*, and this is not a question of that character, but rests on the different doctrine that the universal legacy, by its nature, comprises everything which has not been otherwise validly disposed of. 4 St. Espes-Lescot, Nos. 1313-14; Lebeau vs. Trudeau, 10 An. 164.

An additional reason is that, by the very nature of a universal legacy, where the will only makes other particular bequests, no portion of the estate remains "undisposed of," which is a condition precedent to the application of Art. 1709, by its own express terms.

In one case, this Court said : " by the death of the particular legatee during the lifetime of the testatrix, her will, under Civil Code Art. 1690, would be read as if his name had never been mentioned in it, unless a different intention of the testatrix could be gathered from the face of the instrument." Succession of Foucher, 18 An. 409.

Reading Burnside's will as if the lapsed legacies had never been written in it, there would be no doubt that Beirne would take all except the effective legacies.

I have thus undertaken to eviscerate the pivotal questions upon which this important litigation hinges, and to announce the course of independent reasoning and investigation by which I have reached the same conclusions announced in the chief opinion just read, and there much more ably and elaborately sustained. For these reasons, as well as for those there stated, I concur in the decree herein.

Rehearing refused.