(77 South. 506)

No. 22561.

Succession of CUNNINGHAM.

(Jan. 3, 1918.)

*(Syllabus by the Court.)*

1. CONSTRUCTION OF WILLS — INTENTION OF TESTATOR.

"In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament." Civ. Code, art. 1712.

2. CONSTRUCTION OF WILLS—LEGACY TO ONE OF TWO OF SAME NAME.

"In case of ambiguity or obscurity in the description of the legatee, as, for instance, when a legacy is bequeathed to one of two individuals bearing the same name, the inquiry shall be which of the two was upon terms of the most intimate intercourse or connection with the testator, and to him shall the legacy be decreed." Civ. Code, art. 1714.

3. "OLOGRAPHIC TESTAMENT."

"The olographic testament is that which is written by the testator himself. In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the state." Civ. Code, art. 1588.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Holographic Will.]

4. WILLS ⬥132—"OLOGRAPHIC TESTAMENT"—VALIDITY.

It is not necessary for the validity of an olographic testament that it be written on the same day and at one time. It suffices that it be written entirely, dated, and signed by the hand of the testator.

5. WILLS ⬥170—CONSTRUCTION—CHANGE OF INTENTION.

A change of intention of the testator from that expressed in the will must be made by the testator. The court cannot presume any change of intention for him, when he has done no act which supposes a change of will.

6. WILLS ⬥193—REVOCATION—DIVORCE AND SETTLEMENT OF COMMUNITY RIGHTS.

Divorce and settlement of community rights do not revoke a will previously made by husband or wife.

7. WILLS ⬥186—REVOCATION—FORM.

The act by which a testamentary disposition is revoked must be made in one of the forms prescribed for testaments, and clothed with the same formalities.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Succession of Edward Cunningham. Petition by Patrick H. Cunningham and others to set aside a judgment probating an olographic will, opposed by Mrs. Elizabeth Grace Cunningham, with Mrs. Mary Cunningham Brooks intervening. From a judgment of the civil district court, dismissing the petition, and declaring another instrument to be the olographic last will of deceased, petitioners and intervener appeal. Affirmed.

William J. Hennessey, Patrick Hennessey, and Gustave A. Llambias, all of New Orleans, for plaintiff appellants. Anthony J. Rossi and Charles I. Denechaud, both of New Orleans, for intervener appellant. Michel Provosty and T. Semmes Walmsley, both of New Orleans, for appellee Mrs. Elizabeth Grace Cunningham

SOMMERVILLE, J. The trial judge, in an ably written opinion, in favor of Mrs. Elizabeth Grace Cunningham, the divorced wife of decedent, has stated the facts of the case, and the law applicable thereto. It will be adopted as the opinion of this court. The legal heirs of Edward Cunningham have appealed.

The opinion of Judge Théard follows:

"Edward Cunningham died on June 27, 1915, leaving an olographic testament as follows:

" 'New Orleans La.  July 6, 1909.

" 'Being of Sound Miend and good Bodly health I do hereby make this my last will and testement I give and Beaqueath to my Dear Wife all that I may die possesed of and all money due me from all sorces and all Deposits in the New Orleans National Bank and the Hibernia Bank of New Orleans La.

" 'Written by my Self this Sixth day of July 1909 and Signed by my Self

" 'Ed Cunningham.'

"At the time of the confection of said testament the decedent was married to Elizabeth Grace. On May 7, 1914, she obtained against him a judgment of separation from bed and board. Seven days later, by notarial act, a settlement of the community of acquêts and gains, dissolved by said judgment was effected between the parties, by the terms of which Mrs. Eliz-

abeth Grace, in 'settlement and partition of said community, and as a compromise of all rights and claims of the said Mrs. Cunningham and Edward Cunningham against each other,' received $4,500, and she transferred to the decedent 'all and singular such rights, title, and interest which the said Mrs. Cunningham has or may have had in and to the assets belonging to the community lately existing between her and the said Edward Cunningham, and more particularly such rights, title, and interest as she has or may have had to' certain real estate standing in her name, but acknowledged to belong to the said community.

"Part of the said real estate and some movables constitute the only assets left by the decedent.

"On June 14, 1915, Mrs. Cunningham obtained a judgment of divorce a vinculo matrimonii, thereby ceasing to be decedent's wife, thirteen days before his death.

"Among the effects of the decedent was found a document entirely written, dated, and signed by him, and which, literatim et verbatim, is as follows:

" 'New Orleans La May 13—1914

" 'I Edward Cunningham being of Sound Mind and Bodely health and Knowing the uncertainty of life

" 'I do Hereby make this my last will and testament

" 'I wish that my Property at 1520 Dufossat St be rented also property 816 Arabella St be rented, until my debt to the Industria Homestead Association be paid The amount Borrowed this 12 of May 1914 is fifty Five Hundred dolars after the debt is payed I wish that My Executor take care of my Brother Jams N. Cunningham and my Sister Mary and Such of her Children who may want help and I wish that the dufossat St. property be Kipt rented and the revenue applied to Care for my Brother James and my Sister Mary. The Executor may Sell the Arrabella St. property iff he deems fit, to pay of debt on both properties I also wish that a lot be purchased in the Metrie Cematiry and a nice tomb be erected and my body placed there in and that prares for the repose of my Sole may be Said once a month in the Holy Name Churche in Algiers and to be payed for by my Executor.

" 'The Commissions which ma be due me from the firm of Black Rogers & Co be payed to my Executor The Expirations of Insurance on my books I leave to Clarence J Rogers of the firm of Black Rogers & Co I have Oil Stock Certificates in the Safe of Black Rogers & Co which I will to my Nephew J. L. Cunningham Jr

" 'I appoint my Brother John L. Cunningham of LaFayitte La my Executer without Bond

" 'I also apoint Peter Moony of New Orleans La as Co Executer without Bond

" 'New Orleans La February 5th 1915

" 'I give to my personal Friend Philip Reich now Clerk at Bostonian Boot Shop my Watch and to my Friend Rudolph Herepick now Engineer of Union Brewing Co my wach Chain

" 'Written in my own hand this fifth day of February 1915              Edward Cunningham'

"Another instrument, written and dated by the decedent on May 17, 1915, was also found among his papers, but, as it bears no signature, it is of no effect as a will.

"The testament of July 6, 1909, which, at the request of Mrs. Elizabeth Grace, divorced wife of decedent, was admitted to probate and ordered executed by this court, is attacked by decedent's brothers and sisters, on the ground that it lapsed for want of a legatee, the universal legacy therein having been made to decedent's wife and he having no wife at his demise; and on the further ground that it has been revoked by the aforesaid act of settlement of May 14, 1914, by the instrument of May 13, 1914, February 5, 1915, if held to be a valid testament, and by the judgment of divorce of June 14, 1915, which effected a change in the relations of the parties.

"One of the sisters, Mrs. Mary Brookes, a beneficiary under the instrument of 1914–1915, insists particularly that it is the last will of decedent, and as such entitled to probate and execution. The other brothers and sisters deny the validity of said instrument as a will, for the reason that it is not signed and contains vague and illegal dispositions. Mrs. Elizabeth Grace also denies its validity, for the same reasons, though admitting that the last disposition, dated February 5, 1915, may be upheld as a separate testamentary disposition.

"Concerning the testament of 1909, it is contended that as the legacy to 'My Dear Wife' is not made to Mrs. Elizabeth Grace by name, it was meant for the person, whoever she might be, who would be the wife, at the time of death of the testator, and not for the person actually married to him at the time of the confection of the testament. The testator, claims counsel for the brothers and sisters, wrote with reference to the period of his death, or he would have named his wife or referred to her as his present wife. The contention further is that the language is not merely descriptive of the legatee, but designates her relationship, and that, in any event, if the testator had in mind the person who was then his wife, his intention was that she should receive the legacy only if she continued in that relationship till his death.

[1, 2] "In considering the matter, reference to the French commentators will be instructive, because, although the Code Napoléon fails to contain rules for the interpretation of testamentary dispositions, such as are comprised within articles 1712 and 1723 of the Revised Civil Code of Louisiana, they have been consecrated by the French jurisprudence. Thus it is of the cardinal rule, laid down by article 1712, that 'in the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper significa-

tion of the terms of the testament.' Also, 'in case of ambiguity or obscurity in the description of the legatee, as, for instance, when a legacy is bequeathed to one of two individuals bearing the same name, the inquiry shall be which of the two was upon the terms of the most intimate intercourse or connection with the testator and to him shall the legacy be decreed.' Article 1714.

"Dalloz, Codes Annotés, vol. 2, p. 659, No. 166, says:

"'If it be indispensable that the beneficiary of the legacy be clearly designated, it is not necessary, under penalty of nullity, that the testator should indicate by his names and surname the person whom he wants to gratify; it suffices that he makes him known by unequivocal marks.'

"'Legacies made to a chambermaid, a cook, a servant, can sufficiently designate the servants of the stated employment who were in the service of the testator at the time of the testament.' Page 660, No. 181.

"To the same effect are Baudry Lacantinerie et Colin, vol. 2, p. 11, No. 1842: 'Upon this principle the authors, as well as the decrees, are unanimous. All agree in recognizing that the judges of the facts have a sovereign power of appreciation to solve the question whether the testament attests the liberal intention of the testator, and designates in a sufficient manner both the legatee and the things bequeathed.'

"'No. 1842, bis: * * * It is thus that as regards the designation of the legatee, it has been adjudged that it was in no wise necessary to designate the legatee by his true name. It is thus, also, that it has been decided that the designation of a function which he exercises, and of his domicile, is sufficient to designate the legatee, when that one alone exercises his function in the locality indicated by the testament. It has even been decided that legacies made to a chambermaid, a cook, a servant, could sufficiently designate the servants of the stated employment who were in the service of the testator at the time of the testament.'

"The words, 'My Dear Wife,' are therefore so effective in designating the wife of the testator at the time of the confection of the will that it is as though he had named her. No one else was then in his contemplation. Any doubt which might exist as to this is removed by Merlin, in his Repertoire de Jurisprudence, verbo Institution D'Heritier, vol. 15, § 6, No. 2, p. 374, when he declares that if a married man makes a legacy to his wife without naming her, and she dies, and he remarries and his second wife survives him, the latter cannot take the legacy, which must be decreed to have lapsed by the death of the first wife. Says Merlin:

"'If a testator, being single or married in first marriage, institutes his wife, without designating her by her proper name or by any other certain mark, and at his death he should have been married two or three times, could his last wife, who survives him, claim the effect of that institution?

142 LA.—23

"'The affirmative is undoubted in the case of a testament made by a man still single in favor of his future wife. But there is greater difficulty as regards a disposition made by a testator married in first marriage. Menochius and Fachinee pretend that the last wife is supposed to have been instituted; Mantica, Brunneman, Peckius, Sommeren and Voet contend, on the contrary, that the institution is limited to the first wife, and that, consequently, it has lapsed by her predecease.'

"And after giving the arguments pro and con, Merlin concludes, with the large majority of the commentators, in favor of denying the legacy to the second wife, by advancing as a most convincing argument that:

"'It must not be presumed that a husband is so little attached to his wife, and to the faith which he has sworn to her, as to think during her life of a second wife and make a disposition in her favor. Such a presumption is too contrary to good morals and to public decency for the courts to confirm a disposition of which it would be the only basis. Besides, it often happens that a first wife deserves the liberalities of her husband by her sweetness, her complacency, and the regularity of her conduct, while a second wife makes herself unworthy of them by a harsh, imperious, and fantastic temperament; whence, says Voet, it would happen that she [the second wife] would take the reward of one well-deserving, of which she was in no manner worthy.

"'That opinion,' the jurist continues, 'can also be supported by a decree of the 1st of February, 1709, reported by Brillon, to the effect that a legacy made by Madame Bethune D'Orval to her cook, provided the latter be in her service up to her decease, was not due to the cook who was there at the time of the death of the testatrix, the one living at the time of the testament being predeceased.'

"Accordingly, the test is not whether Mrs. Elizabeth Grace was married to the decedent at the time of his death, but whether she occupied that relation to him when he drew his will. The divorce put an end to that relation, but did not destroy her individuality. And as the legacy was to her individually, and the language, 'My Dear Wife,' was purely descriptive, it would seem that the contention that the legacy has lapsed is not well-founded.

"The case of Succession of Lefort, 139 La. 51, 71 South. 215, does not in any manner militate against this conclusion. There the court was concerned with a disposition in these words: 'I bequeath to the priest of this church the sum of two thousand dollars and I appoint him executor of this will without bond. For the care of our lot in the cemetery and for having masses said for the family and the most neglected souls in purgatory, one thousand dollars.'

"The majority of the court (composed of the Chief Justice, Justice Sommerville, and Judge Claiborne, sitting ad hoc in place of Justice O'Niell, recused on account of personal interest), held that, as the appointment of an execu-

tor looks to the future, the testatrix must have intended to appoint the person who would fill the position of priest at the time his services as executor would be required, and that 'the trust was conferred upon the officer and not upon the individual,' and recognized as executor the priest in office at the time of the decedent's demise in preference to the one who had been there when the will was executed. There is also found additional argument in support of the majority's views in the money legacies accompanying the executor's appointment. * * *

"It may be rightfully presumed, therefore, that when a testamentary executor is designated by his official title, the office being a continuing one and the incumbent subject to change, the testator intended to appoint the officer, and not the individual. But the presumption is not conclusive, and it is the court's duty to inquire into all the circumstances, in order to ascertain whether the testator meant the officer, whoever he might be at the time of the opening of the succession, or the private person who filled the office at the time of the will. * * *

"In this case, however, there is no question of testamentary executorship or mandate beginning at the testator's death, but of a legacy. There is no question of an officer or a titular, such as the bishop of a certain city, the mayor of a certain community, the Governor of a certain state, the trust officer of a certain company, and the like, whose title or office passes to a successor. The question is as to one who occupies a certain relation to the testator, such as a wife, a cook, a servant, a chambermaid, and who is identified by that relation. The position of wife is most exalted, most entitled to respect, but it is not a dignity, a title, an office.

"The Lefort Case, it is repeated, is not applicable here. The difference of situation is too evident. Because the relation of wife, by which she was identified, has ceased, is no reason to hold that the legacy to Mrs. Elizabeth Grace has lapsed."

In the Lefort Case there were two individuals in court claiming a legacy of $2,000, and to be appointed executor of the will—the priest who held office in the church in St. Mary at the date of the will, and he who held office at the time the will was to be executed. And the court held that the will of the testator referred to the priest in office at the time the will was to be executed. The priest who was appointed executor in the will and to say masses for the deceased members of the family of the testatrix was held to be he who was in the parish and in charge of the church when the will was to be executed and the masses said.

In the case now before the court there is no confusion as to the individual who was made his beneficiary by Edward Cunningham. Appellants say in their brief:

"There is no question as to the identity of the legatee in this case."

That person was his wife; and if he had died immediately after making his will, Mrs. Elizabeth Grace would have taken under the will without question. Edward Cunningham did nothing subsequent to the date of the will to indicate a change of intention on his part. He did not revoke the will. And Mrs. Elizabeth Grace has not in any manner renounced her rights thereunder.

Appellants on their brief say:

"If the will had named the legatee by her proper name and had also designated her as his 'wife,' then the contention of the appellee might have some force."

The intention of the testator is clear. He gave to his "wife," the wife he had at the time he made his will—Mrs. Elizabeth Grace. He did not refer to his former wife, then deceased; and he did not subsequently marry. There is no question of the identity of persons. To hold that Mrs. Elizabeth Grace was not referred to in her husband's will would be to nullify that will and defeat her husband's clearly expressed intentions. Mrs. Elizabeth Grace was referred to at the time the will was made, and to hold that she is not now referred to therein would render the will without effect. That would be contrary to law.

"A disposition must be understood in the sense in which it can have effect, rather than that in which it can have none." C. C. 1713.

Reference is made to the Succession of Burnside, 35 La. Ann. 708, as holding contrary to the views herein expressed.

In that succession, the question was whether the decedent in disposing "of all my worldly estate," and in appointing "Oliver Beirne, my late partner in trade, my sole executor to carry this, my last will, into full execution,"

and in giving "the residue of my property of every description—say stock in trade, promissory notes, accounts, my interest in the firm of J. Burnside & Co., stocks, etc., * * * to my executor, Oliver Beirne, subject to the payment of all my just and lawful debts," was a universal legacy or not, and whether Mr. Burnside intended to give only to Mr. Beirne the property which he had owned at the date of the will and which was found in his succession, or the residue of the property owned by him at the date of his death. There was no question as to who was the beneficiary.

The court say:

"The testator's disposition is there, and effect must be given to it. * * * What ground in law is there to defeat that intention? How dare a court disregard that intention, if it be assuredly ascertained?"

And the court held that in giving "all his worldly estate," Mr. Burnside gave "all" that he died possessed of, although the constituent portions of the estate had been changed. The personal property owned by Mr. Burnside at the date of his will had been changed to real estate at the date of his death.

The court, in that case, did not annul and set aside a testament, as defendants are now asking the court to do in this case.

[3, 4] "Is the instrument bearing two dates, May 13, 1914, and February 5, 1915, and signed by Mr. Cunningham, an olographic will, or does it contain a single testamentary disposition bearing the latter date?

"The instrument, copied above, is written in black ink up to and including the sentence, 'The commissions which may be due me from the firm of Black Rogers & Co.,' and thence, up to and including the words 'coexecutor without bond,' in blue ink. The disposition immediately following (with an intervening blank line), dated New Orleans, February 5, 1915, is in black ink. That is the disposition claimed by one of the counsel to be a codicil to an unsigned will.

"There is nothing to show that the preceding part of the instrument was written in two or more sittings. The difference in ink does not necessarily mean that there were two sittings; the black ink used by the testator may have given out, and he may at once have used blue ink as a substitute. But the instrument bears two dates. That, however, does not affect its validity as an act of last will; that means that it was begun on May 13, 1914, and concluded on February 5, 1915.

"The commentators on article 970, Code Napoléon, which is similar to our article 1558 [1588], agree on the principle. Some of them are here quoted:

"'It must be remarked that the testator is not bound to write his dispositions in one context or in one day. Article 970 does not require for the olographic testament, as article 976 for the act of superscription of a mystic testament, that it be done without interruption or turning aside to other acts. * * * But when the testator has taken several days to make his testament, the accomplishment of the formality of the date and of the signature must be particularly ascertained. * * * The testator, even after having taken several days to write his dispositions, can limit himself to one date; that is to say, to the date of the day on which he has completed them, and to a single signature for the whole. * * * In the same way, he may put several dates, as many dates as days, and use only one signature. * * * Assuredly such a testament would have several dates, but no text opposes this, so long as the signature applies to all the dates equally; and the conclusion to be reached is, not that the date is uncertain, which would make the testament null, but simply that the testator has taken several days to write it, which would not prevent it from being valid.' Demolombe, Traite des Donations, vol. 4, pp. 118, 119, No. 129; Dalloz, Codes Annotés, vol. 2, p. 575, Nos. 192, 193, 195, 196.

"'And even an olographic testament bearing two different dates, one at the beginning and another at the end, cannot be annulled under pretext that there is no certainty in the date. It must be supposed that the testator has employed several days in making his testament.' Id. No. 104.

"The instrument in question, therefore, conforms to all the requisites of article 1558 [1588]; it is entirely written, dated, and signed by the testator. It was begun by him on May 13, 1914, and concluded on February 5, 1915. I say concluded on February 5, 1915, because I cannot follow counsel in their argument that the testator meant to limit his signature to the one testamentary disposition bearing that date. Had he so intended, he would not have written that disposition immediately after the others. The fact that he dated it as its beginning, and wrote at the end, 'Written in my own hand this 5th day of February, 1915,' arose doubtless from a desire to fix the exact date at which his last bequest was made, under the erroneous belief that that bequest, coming after a long interval, must be specially dated in order to be effective. The signature, in my judgment, applies to all that precedes it, and makes the instrument in its entirety a valid olographic testament."

[5-7] Defendants again say on their brief:

"The question propounded to the court is whether the divorce and the property settlement had the effect of rendering the legacy in favor of decedent's 'wife' lapsed or void?" "There is an implied condition in the will that Mrs. Grace would continue to be Mr. Cunningham's wife, to take the legacy." "It cannot be denied that change of circumstances raises a presumption of change of intention." "The pivotal question, then, is whether or not the change of conditions since the making of the will produced such a change in testator's previous moral obligations and duties and raises a reasonable presumption of alteration of his mind."

A change of intention of the testator from that expressed in his will must be made by the testator. The court cannot presume a change of intention for him, when he has done no act which supposes a change of will.

Divorce and a settlement of community rights do not revoke a will previously made by husband or wife.

"By the act of settlement of the community, Mrs. Elizabeth Grace received only what was hers. Her acceptance of $4,500 in payment of all rights, title, and interest she had or might have had in the assets of the community was not a renunciation of any bounty which her husband (for she was still his wife) had chosen to bestow or might choose to bestow on her out of those same assets. Her husband might still have continued to cherish her, notwithstanding the separation.

"The will of 1909 was not revoked by the change in their relations resulting from the divorce. The bequest was to the individual, not to the wife, as already shown. Besides, the divorce was obtained by her, not by him; why should he have felt resentful towards her? He was at fault—the more reason for being anxious to atone.

"The case of Lansing v. Haynes, 95 Mich. 16 [54 N. W. 699, 35 Am. St. Rep. 545], is not applicable, because in that state the statute of wills preserves in force 'the revocation implied by (the common) law from subsequent changes in the conditions and circumstances of the testator'; and the court held that a divorce and settlement operated a change in the conditions and circumstances of the parties, such as to imply a revocation of their respective testamentary dispositions. Testaments in this state are gov-

erned by the Civil Code, not by the common law. Here the tacit or implied revocation results from some other disposition of the testator, or from some act which supposes a change of will. Article 1691. 'The act by which a testamentary disposition is revoked must be made in one of the forms prescribed for testaments, and clothed with the same formalities.' Article 1692. Implied revocation, by reason of a change in the testator's conditions and circumstances, is not sanctioned by the Code. Moreover, if the act of revocation be an act other than of last will, it must certainly be an act of the testator. The divorce was not the act of the testator; the action was prosecuted by Mrs. Cunningham. And the act of settlement preceding it was the act of the law compelling a settlement of the community after its dissolution at the instance of Mrs. Cunningham.

"Finally, the testament of 1909 is not revoked in its entirety by the one of 1914–1915. The latter, though it was begun on the eve of the act of settlement, and though it makes no mention of the testator's wife, fails to expressly revoke the former. It simply modifies the previous universal bequest to Mrs. Elizabeth Grace to the extent of the special legacies to Clarence Rogers, J. L. Cunningham, Jr., Philip Reich, and Rudolph Herepick. The directions to the testamentary executor to keep the properties rented, and, out of the revenues, after payment of a certain debt, 'to care for my brother, James M. Cunningham, and my sister Mary and such of her children as may want help,' do not constitute a legacy of usufruct to the parties named, and, further, are without effect, because they tend to prolong indefinitely the executor's functions. The other directions to him regarding the purchase of a burial lot, the erection of a tomb and the saying of prayers once a month, are also without effect, as being vague and indefinite and as tending to keep the executor in office indefinitely. Succ. of Herber, 128 La. 111 [54 South. 579]."

Judgment affirmed.

In this cause Mr. Justice PROVOSTY recused himself.

O'NIELL, J., concurs in the decree, but not in the affirmance or approval of the decision in Succession of Lefort, 139 La. 51, 71 South. 215, and hands down a separate opinion. See 77 South. 511.