(123 So. 306)

No. 28849.

JONES et al. v. KYLE.

May 20, 1929. Rehearing Denied June 17, 1929.

Geo. Wesley Smith and T. H. McGregor, both of Rayville, for appellant.

S. R. Holstein, of Winnsboro, for appellees.

ST. PAUL, J. Plaintiffs are the nephews and nieces of James Walter Jones who died at Dunn, Richland parish, La., on April 22, 1926, leaving an estate of about $40,000, to wit, about $15,000 in real estate and the rest in personal property.

They are his nearest of kin and sole legal heirs, and this suit is to annul his last will, in which defendant is named his universal legatee, on the ground that said will "was not entirely written, dated and signed by the hand of the testator"; or, in the alternative, to reduce the legacy to the defendant to one tenth of the estate, on the ground that "at the time of the making of said purported last will and testament by the said J. W. Jones, the said Amanda Kyle was living with the said J. W. Jones as his concubine and continued to do so up until the death of the said J. W. Jones; which said continuous acts of concubinage were public and notorious; that the said Amanda Kyle is of the negro race and the said J. W. Jones was of the caucasian or white race."

I

The will was made on one of the letterheads of the testator used in his mercantile business. At the top thereof is printed "J. W. Jones, General Merchandise." Below this is printed a date line as follows:

"Dunn, La., ———— 191-,"

On the line between the words "Dunn, La." and the figures "191" the testator wrote the words and figures "January 10th," and following the figures "191" he wrote the figure "4."

Then he wrote the body of the will. Two lines below the body of the will he signed his name, thus:

"James Walter Jones."

Thus the will stood until April 11, 1919. On that day he wrote at the bottom of the will, about three lines below his signature, the date "April 11/1919"; just below this he wrote the word "Witnesses." · He then folded the will so as to hide everything but the date "April 11/1919" and the word "Witnesses," and presented the paper to H. M. Hazel and Lee Donnell, requesting them to sign as witnesses, which they did; but without informing them of the nature or contents of the instrument which they had thus witnessed.

So that the will when offered for probate read in full as follows, the whole thereof being in the handwriting of the testator except the signatures of the witnesses, and the printed matter first above set forth, all of which we have inclosed in brackets to distinguish same from what is written in the testator's own handwriting, thus:

"[J. W. Jones—General Merchandise.]

"[Dunn, La.,] January 10th [191]4.

"I Hereby Bequeth All the Property Real and Personal that I may Die Possessed of to my cook Amandy A. Kyle. And if it be necessary in order to conform to the law I Hereby Appoint her Executrix without Bond.

"James Walter Jones

"April 11/1919.

"Witnesses:

"[H. M. Hazel.]

"[Lee Donnell.]"

■ It is clear that all that which is not in the handwriting of the testator must be disregarded. R. C. C. 1588, 1589; McMichael v. Bankston, 24 La. Ann. 451; Succession of Roth, 31 La. Ann. 315. Hence before April 11, 1919, the will was without a date, since neither the century nor the decade, in what

purported to be its date, were in the handwriting of the testator. Succession of Robertson, 49 La. Ann. 868, 21 So. 586, 62 Am. St. Rep. 672, Succession of Beird, 145 La. 756, 82 So. 881, 6 A. L. R. 1452.

■ But there is no law which forbids a testator, who has made a will which is incomplete for want of a date, from completing such will by dating it properly. For "it is not necessary for the validity of an olographic testament that it be written on the same day and at one time. It suffices that it be written entirely, dated, and signed by the hand of the testator." Succession of Cunningham, 142 La. 701, 77 So. 506, Cf. Gaude v. Baudoin, 6 La. 722.

■ And the date to an olographic will may be placed at the head, at the foot, or in the body thereof; it may be placed even below the signature of the testator. Lagrave v. Merle, 5 La. Ann. 278, 52 Am. Dec. 589; Succession of Fuqua, 27 La. Ann. 273; Zerega v. Percival, 46 La. Ann. 590, 15 So. 476.

■ Nor does the fact that there are subscribing witnesses to the olographic will affect in any way its validity. That is mere surplusage, and to be disregarded. Heirs of Andrews v. Andrews' Executor, 12 Mart. (O. S.) 713.

■ Nor do we find any uncertainty about the date of the will. The date first attempted "January 10th 4" *(as written by the testator)* is no date at all, as we have said. Hence the will has but one date to wit "April 11/1919."

■ We are not impressed with the suggestion that the date "April 11/1919" was not intended as a dating of the will but merely as an indication of the date on which the witnesses attested the same. Even if such were the testator's thought, it none the less evidenced his intention on that day to persist in the dispositions made by him, and the fact remains that by placing the date there in his

---

---

own handwriting he did all that the law required of him to give that intention full effect. For he then had, which he had not before, an instrument purporting to be his last will and entirely written, signed, and dated in his own handwriting, which is all that the law required. R. C. C. 1588.

We therefore think that the trial judge erred in holding the will invalid.

## II

■ The Revised Civil Code provides that: "Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it cannot exceed one-tenth part of the whole value of their estate." R. C. C. 1481.

In Succession of Jahraus, 114 La. 456, 38 So. 417, this court had occasion to inquire into the meaning of "open concubinage." The court said that the word "concubinage" described a status and not mere acts of fornication or adultery however frequent or even habitual; that the word "open" means free from concealment, reserve or disguise, not secret, but plain and aboveboard; that "open concubinage" means one that is plain and aboveboard, without secret, reserve, or disguise, not merely one that is notorious; that "the concubinage should be so public as to be practically avowed, not necessarily by word, but at any rate by unambiguous, unequivocal conduct; that the relations must be such that, when sought to be made the basis of judicial action, no odious inquisitions might be necessary, and no nice poising of testimony."

In this case the defendant occupied the position of cook and housekeeper for the testator, and had occupied that position for more then 20 years. She also attended to customers who came to his store and had access to his cash drawer. From 1904 to 1907 or 1908 she slept on his premises, occupying the third room in his house, he occupying the second room and an employee occupying the front room. About 1907 or 1908 a house was built for her occupancy on the land of the testator, and from that time she occupied this house with her two nieces.

Two witnesses testify that the defendant and the testator lived in concubinage from the time of her first advent into his house until the time of his death, and that this concubinage was notorious and not concealed by them. These witnesses are W. B. Stansell and J. W. Brooks. John Butler testifies simply that he once found the defendant in bed with testator in the daytime. Sam Stout and Cushing Brooks testified that they heard rumors and "general talk" that the relations between them were not proper, and that it was general public opinion that the deceased was keeping the defendant.

On the other hand defendant denies that she had any other relations with the deceased than those of cook and housekeeper and assistant in his store. And some 12 or 15 witnesses testify that they were in a position to know of the relations between the two from having frequently been at the homes of one or the other of them, had slept at their homes for weeks and months at a time, and had never seen or heard that there was anything improper in the relations between them, and do not believe that there was.

It was upon this testimony and the authority above cited that the trial judge says on this phase of the case: "There can be but little doubt or question, from the testimony *and the will*, that the testator and the defendant had been living for a number of years in a state of concubinage; however, the testimony does not show that they were living together in *open* concubinage." (Italics ours.)

We think his finding was correct. It is quite true that this testimony, *and the will,* leave little room for doubt that defendant and the testator lived in a state of concubinage. But the testimony alone, *without the will,* might leave some room for doubt; and it will be remembered that the testator had *carefully concealed the contents of the will* during his lifetime. This is one circumstance going to show that the deceased was not willing to make public his relations with the defendant. Another circumstance tending to show that the deceased was not willing to make those relations public is that, since 1908 (Act 87 of 1908) concubinage between whites and blacks, whether open or secret, has been made a felony in this state. It is therefore not to be presumed that a white man would publicly avow such relations with a black woman.

But be that as it may, the fact remains that according to the preponderance of the evidence the deceased did not publicly avow his relations with the defendant, but on the contrary kept her in his employ ostensibly as cook and housekeeper and assistant in his store, and that their relations were not those of "open" concubinage, but only of illicit intercourse and secret concubinage. To fall under the ban of article 1481, R. C. C., the concubinage must be open.

### III

As we have said the trial judge found the facts to be with the defendant on the issue of "open" concubinage; but he found the law to be with plaintiffs on the issue as to the invalidity of the will, and therefore gave judgment for plaintiffs.

But we have said that we disagree with him as to invalidity of the will, and we must therefore reverse his judgment.

### Decree.

The judgment appealed from is therefore reversed, and it is now ordered that plaintiffs' demand be rejected at their cost in both courts.

THOMPSON, J., dissents.

O'NIELL, C. J., absent, takes no part.

THOMPSON, J., is of opinion that the will is valid in form, but thinks the will ought to be reduced. It is admitted that the parties had lived in a state of concubinage. They lived in the same house, occupying adjoining connected rooms, to the knowledge of the public. This makes the relation open within the meaning of Civil Code, art. 1481.