O’NIELL, Chief Justice.
 

 This is a suit to declare null what purports to be the olographic will of Dr. Charles Collins Buck. He died at his residence in New Orleans on August 12, 1941, at the age of 82 years. His wife had died on October 29, 1937, intestate. Neither of them left a descendant heir.
 

 The plaintiffs in this suit are Dr. Buck’s heirs at law, namely, his sister, Mary Edith . Buck, residing in Weems, Virginia, and several sons and daughters of deceased brothers and sisters of Dr. Buck. All of them are nonresidents of Louisiana, some residing in' Maryland, others in North Carolina, and others in South Carolina.
 

 The will was probated as being dated December 6, 1939. It purports to give to one Ada Banks Pautsch everything the testator died possessed of, making her his universal legatee, and appointing her executrix of his will, without bond and with seizin of his estate. She is the defendant in this suit.
 

 The causes for which the plaintiffs claim that the alleged will is null are, first, that on December 6, 1939, Dr. Buck was physi.cally and mentally incapable of making a will, having then and at all times near that date senile dementia, paralysis, arteriosclerosis, and other infirmities which completely incapacitated him; second, that the
 
 *559
 
 document is not dated; and, third, that it was not written, dated or signed by the decedent.
 

 After a hearing of the case on its merits the judge gave judgment for the defendant, declaring that the instrument in question was the olographic will of Dr. Charles Collins Buck, that he was of sound mind at the time of the making of the will, that it was dated December 6, 1939, and was entirely written, dated and signed in the handwriting of the testator. The plaintiffs are appealing from the decision.
 

 Article 1588 of the Civil Code, defining the olographic testament, declares: “In order to be valid, it must be entirely written, dated and signed by the hand of the testator.” And article 1655 requires that, in order to be probated, an olographic will “must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator’s handwriting.”
 

 The evidence as, to whether Dr. Buck was mentally capable of making a will on December 6, 1939, is conflicting. Four well-known and trustworthy witnesses, who were not doctors, but who were in the presence of Dr. Buck, in his bedroom, on December 6, 1939, and who had an opportunity to judge of his mental condition, testified that he was of sound mind on that day. They saw him sign two important notarial acts, while he was lying or reclining in bed, that, afternoon, and they testified that he understood fully what he was signing. One of them was the notary public who passed the two acts; another was a very prominent attorney at law residing in this city; another was a resident clergyman of very high repute; and the fourth was a stenographer, a woman of excellent reputation. Dr. Buck was then and had been for four days confined to his bed, in his last illness. He remained confined to the bed, continuously, gradually growing worse for a year and eight months, until he died.
 

 The testimony of the four witnesses who were in Dr. Buck’s bedroom and considered him sane on December 6, 1939, is corroborated in some measure by the testimony of five other witnesses who were not experts on mental ailments. One of them was a lady who attended a Thanksgiving dinner, at which Dr. Buck was also a guest, on the- last Thursday in November 1939. She said that she considered the doctor very intelligent, well informed, and entertaining in his conversation. Another of the witnesses who testified to Dr. Buck’s soundness of mind was a prominent civil engineer who was acquainted with him for several years and conversed with him as late as November 2, 1939. The third one of these witnesses who considered Dr. Buck of sound mind was an osteopath who treated the doctor professionally. This witness testified that the doctor called at his office, unattended, walking with crutches, but showing no symptoms of mental incapacity, as late as November 28, 1939 — which was on the eighth day befqre the alleged will is supposed to have been made. The fourth witness who testified to Dr. Buck’s sanity was identified as an economist and author, who was well acquainted with the doctor
 
 *561
 
 and conversed with him as late as November 2, 1939. The fifth one of these witnesses was in charge of the land-lease department of an oil refining company, who had known Dr. Buck for about twelve years, and had negotiated with him for a lease on his land. The witness testified that he had conversed with Dr. Buck as late as the latter part of November or early part of December, 1939, and that, although he considered the doctor erratic and not of good judgment, he was not of unsound mind.
 

 The evidence tending to prove that Dr. Buck was of unsound mind on December 6, 1939, shows his condition only a short time before and after that date.
 

 A prominent banker in New Orleans, who had known Dr. Buck for nearly 30 years and had conversed with him often, testified that the doctor was mentally unsound during all of the last ten years of his life.
 

 The records of the Charity Hospital show that Dr. Buck was admitted to the institution at 9:30 p.m. on July 10, 1937, suffering from a fracture of the neck of the right humerus — which means the bone extending from .the shoulder to the elbow— that he was discharged from the hospital on July 19, 1937, and that the final diagnosis showed that he was afflicted also with senility. The hospital record shows that the patient had been paralyzed for about 15 years. The fact that he was afflicted with senility is noted again at the end of the chart headed “History Sheet,” showing the condition of the patient during his stay in the hospital.
 

 ' The records of the Charity Hospital show also that Dr. Buck was admitted there again on the 10th and discharged on the 15th of December 1939; and the diagnosis made at that time shows “Senile psychosis.” In this connection there is a notation on the “History Sheet” that when the patient was admitted he was not acutely ill but was “mentally incapacitated” and had “obvious arteriosclerotic cerebral changes.”
 

 A prominent physician, who is one of the best known dermatologists in New Orleans, who had not treated Dr. Buck professionally but was his close friend for many years, testified that he saw Dr. Buck on January 6, 1940, and at a later date in that month, and that on both occasions Dr. Buck was physically and mentally incapacitated — unable to reason, or to talk coherently, and unable to get out of bed, or to help himself in any way.
 

 Another prominent physician who qualified as an alienist, and was assistant city alienist, testified that he examined Dr. Buck on February 2 and 4, 1940, and that he was then in a state of dementia. The testimony of this witness leaves no doubt that Dr. Buck was absolutely incapacitated mentally on February 2 and 4, 1940, which was less than two months after the 6th of December 1939.
 

 Another witness, a prominent psychiatrist in New Orleans, examined Dr. Buck on January 6, 1940, at the request of the attorney for Mrs. Ada Banks Pautsch, named as universal legatee in the alleged will, dated December 6, 1939. The purpose of this examination was to defend a- suit for the interdiction of Dr. Buck. The wit
 
 *563
 
 ness testified that at the time of the examination Dr. Buck was confined to his bed, acutely ill and helpless; that he was too weak to change his position in the bed without help; that he was senile and mentally incapable of attending to his person or property. The attorney read the definition given by this court in Kingsbury v. Whitaker, 32 La.Ann. 1055 at page 1066, 36 Am.Rep. 278, and asked the witness whether Dr. Buck, according to that definition, had testamentary capacity; and the witness replied that he was sure that Dr. Buck did not have testamentary capacity at the time when the witness saw him. The quotation which was read from Kingsbury v. Whitaker, 32 La.Ann. 1055 at page 1066, 36 Am.Rep. 278, is as follows:
 

 “There are many cases where mental health is impaired, where old age has caused a certain dilapidation of the mental structure, where there are curious mental eccentricities of thought and action, and, in all these cases, if the individual retains sufficient of the reproductive faculty to collect in his mind, without the suggestions of others, the particulars of the business in hand, and the possible objects of his bounty, if he has the power of retaining these in his mind a sufficient length of time to perceive their relations to one another, and if he is able to form a sound and rational judgment with respect to them, then he is, according to law, in a position to exercise this privilege of disposing of his own property;”
 

 That quotation is followed by one taken from Browne’s Med. Jur. of Insanity, Section 23, thus:
 

 “It is essential to the exercise of the testamentary power that the individual should be in condition to understand the nature of the testamentary act, and appreciate its effects, that he should know what property he has to dispose of, the claims that are upon him, and their relative importance, and should desire that his property should be disposed of in a certain manner.”
 

 Another of the most prominent of the psychiatrists in New Orleans testified that he visited and examined Dr. Buck on February 13, 1940, at the request of Mrs. Pautsch, the universal legatee named in the alleged will; and that her request was that he, the witness, examine Dr. Buck “with regard to his testamentary capacity.” The witness testified that Dr. Buck “seemed to be in a marked stage of dementia.” The attorney read to this witness also the definition in Kingsbury v. Whitaker, 32 La.Ann. 1055 at page 1066, 36 Am.Rep. 278, and asked him whether, according to that definition, Dr. Buck had testamentary capacity at the time when the witness examined him, and the witness answered: “At the time 1 saw
 
 him
 
 there was absolutely no question but what he had no testamentary capacity.” The witness testified that Dr. Buck, during the examination, said that he was born in 1959, and that the year in which the psychiatrist was questioning him (1940) was 1919; that he had obtained recently $5,000,000 from his property, and that the money was in bank. These statements of course were only imaginations.
 

 The physician who visited Dr. Buck regularly, as his attending physician, from
 
 *565
 
 the time when he returned from the hospital, about December 15, 1939, until he died, August 12, 1941, testified that the cerebral hemorrhages from which the doctor had suffered had caused mental degeneration, preventing him from keeping a sustained thought; that he, the witness, had known Dr. Buck personally for about four years before he died; that he entertained certain grandiose notions and unreasonable ideas for gaining fabulous wealth, from the time when the witness first knew him until he commenced treating him as his physician on or about December 15, 1939; and that the patient gradually grew weaker physically and mentally until he died.
 

 An attorney at law who had been Dr. Buck’s attorney for sometime previous to December 6, 1939, testified that on that day Dr. Buck was not mentally capable of signing the deed by which he transferred to Mrs. Pautsch 49% of his mineral interest in the large area of land which he claimed. The witness testified that he was a frequent visitor at the home of Dr. Buck. He was there on the occasion of the transfer which Dr. Buck made to Mrs. Pautsch of 49% of his mineral interest, and the witness protested against the transaction. He testified that at that time he'thought that Dr. Buck “would pass on in a few days.” This witness wrote a letter to Dr., Buck’s sister, Miss Edith Buck, which she received in Weems, Virginia, on December 4, 1939, informing her of the doctor’s condition and urging her to come to New Orleans at once. She wired the doctor’s minister in New Orleans asking whether he considered the condition so critical that she should come to New Orleans. She received immediately two telegrams, one from the attorney and one from the minister, saying “come at once.” She arrived in New Orleans at 7:45 or 8 a.m. on December 7, 1939, and nursed her brother constantly until he died. She and the attorney who had summoned her to New Orleans, and Mrs. Pautsch, and perhaps the minister, are the ones who sent Dr. Buck to the hospital on December 10, 1939.
 

 On April 1, 1940', L. Preston Collins, a relation of Dr. Buck, residing in Marion, Virginia, wrote to the attorney who had protested against the transfer made by Dr. Buck to Mrs. Pautsch on December 6, 1939, and asked to be advised of the doctor’s condition. The attorney answered the letter on April 11, 1940, and in his answer, which was duly verified and introduced in evidence in this case, the attorney made the following disclosures:
 

 “A few days before Miss Edith Buck came to New Orleans last December, Dr. Buck was induced to sign certain documents that assigned and placed in the control of a Mrs. Pautsch everything of value that he owned.
 

 “I am certain at the time said instruments were executed the Doctor was in no mental condition to know what he was doing. When Miss Buck came, I advised her of the situation and suggested to her that since it was very apparent that the Doctor was mentally incapacitated on account of his general physical condition and otherwise, that it was advisable to file interdiction proceedings to have a curator
 
 *567
 
 appointed to take charge of his interests and take necessary proceedings to set aside said assignments.
 

 “The interdiction proceedings were filed and are still pending. They would have been disposed of before now, but for the fact that other parties have tried to persuade Miss Buck that to prosecute the interdiction proceedings would be to have her brother declared mentally incompetent, which would, in a sense, be a disgrace. They have tried to get her to dismiss the said proceedings, all of which was for the purpose of trying ..to avoid an attack on the question of the transfers above referred to.
 

 “I have so far succeeded in not having Miss Buck request directly that the interdiction suit be dismissed, but on account of her attitude I have refrained from bringing it to trial.
 

 “The whole situation is very complicated, and can hardly be explained in one general letter, but if the interdiction proceedings are dismissed and the conveyances referred to allowed to stand, I am very much afraid that there will be nothing left for Miss Buck or the Doctor’s other relatives when he passes on.
 

 “I interviewed Miss Buck after receiving your letter and explained to her again the situation, and she requested that I write you and outline the situation, as I have done.
 

 “Dr. Buck is at present a helpless invalid, unable to as much as feed himself.
 

 “At times his mind seems somewhat clearer, but as a whole, he is in no situation to help himself either physically or mentally. It is impossible to state how long he may linger in this condition.”
 

 The attorney who wrote that letter, dated April 11, 1940, is not the one who represents Mrs. Pautsch in this suit, and who was employed to defend the interdiction suit that was brought against Dr. Buck.
 

 Miss Edith Buck testified, substantially, that she was present when the several examinations of her brother were made by the alienists and psychiatrists in January and February 1940, and that there was then no material change in the mental or physical condition in which she found him on her arrival in New Orleans, at 7:45 or 8 o’clock in the morning of December 7, 1939. She testified that at the time of her arrival and during the whole time of her being with him, until his death, “he was mentally and physically incapacitated”; that he was practically helpless, was unable to sit up in bed, and that she commenced feeding him as soon as she arrived.
 

 Although, as we have shown, there is considerable evidence to support the plaintiffs’ allegation that Dr. Buck was not mentally capable of making a will on December 6, 1939, our conclusion from all of the evidence is that the plaintiffs have not proven the alleged insanity with sufficient certainty to justify annulling the instrument on that ground. It is not necessary to decide now the question of sanity or insanity because the evidence convinces us that Dr. Buck did not write the instrument in question and was not
 
 physically
 
 able to write it on December 6, 1939, or at any time near that date. It would have 'required exactly 28 times as much writing
 
 *569
 
 for Dr. Buck to write the instrument as to write the signature on it, Chas. Collins Buck. Signing his name is the only writing that he ever did with a pen during the previous 18 years, since “his right hand forgot her cunning.” The difficulty with which he signed the two notarial acts on that day, as described by the four witnesses who were present, leaves no doubt that it was not possible for Dr. Buck to write a document as long as the one purporting to be his will on December 6, 1939. We must bear in mind that he was confined to his bed during all of that day, and had been so confined during the preceding four days. He signed the two notarial acts while lying in bed. The evidence shows that there was never a time during that day in which Dr. Buck might have written the instrument in question without being observed by someone. The minister called at the house that forenoon; Mrs. Pautsch was in and out of the room from time to time during the day. The doctor had no office at which he might have written the will except his front room, which adjoined his bedroom, and which he used as an office. If he had written the instrument there at any time near December 2, 1939, on which day he retired for his last long rest, it is almost certain that someone would have had knowledge of the making of the will and would have testified that the doctor did in fact write the instrument. Mrs. Pautsch was a frequent visitor at the house, and was in close contact with Dr. Buck in her attention to his land affairs, in a secretarial capacity. And the attorney who then represented Dr. Buck was a frequent visitor.
 

 As far as the evidence goes nobody ever saw the instrument in question — or had any knowledge of its existence — during the lifetime of Dr. Buck. Mrs. Pautsch remained in court during the four days trial of the case but did not offer to testify. At the close of the taking of testimony her attorney announced that, although he desired not to be a witness in the case, he considered it incumbent upon him to explain how the will of the late Dr. Buck got into his bank box. Counsel for the plaintiffs, very properly, did not require an oath to be administered to the attorney for Mrs. Pautsch as a witness. He then explained that, although he could not fix the date definitely, sometime around the date which the instrument bears — meaning the date stated in the judgment of probate— Mrs. Pautsch brought the instrument to his office in the envelope in which it was delivered afterwards by him to the notary public appointed by the court to search for the will, and that Mrs. Pautsch stated to the attorney when she delivered the will to him that Dr. Buck had requested that the attorney should take care of it. There is of course no doubt that the declarations made by the attorney for Mrs. Pautsch, that she delivered to him the document in contest on or about the 6th day of December 1939, and that she then told him that Dr. Buck had requested that he take care of the document, are true. To that extent the declarations of the attorney are not objectionable as being hearsay evidence. But the declarations are not, in any sense, proof of the truth of Mrs. Pautsch’s statement to the attorney that
 
 *571
 
 Dr. Buck had delivered the document to her and had requested that the attorney take care of it. With all due respect to Mrs. Pautsch, the declaration of her attorney as to what she told him is evidence only of the fact that she told it to him, but is not in any sense proof of the truth of her self-serving declarations to him.
 

 Aside from the fact that there is some similarity between the handwriting in the instrument in contest and the acknowledged signature of Dr. Buck on two bank checks dated in 1932, there is really no evidence at all that Dr. Buck wrote the instrument in contest. The similarity between the handwriting in the instrument in contest and the signature on the two checks consists of their being all badly and similarly scrawled. In neither instance has the writing any identifying characteristic. The handwriting expert who testified as a witness in the case, who was a prominent banker in this city, who had studied the subject of comparing and verifying hand-writings for 35 years, and had testified as an expert in many lawsuits, testified that the signature on the two bank checks, made in 1932, did not serve-to prove that the instrument in contest, purporting to be the will of Dr. Buck, was written by him.
 

 In the cross-examination of the handwriting expert, by the attorney representing Mrs. Pautsch in the trial of the case, the attorney propounded to the witness a hypothetical question which in itself casts some doubt upon the question whether Dr. Buck could have written the instrument in question on December 6, 1939, or at any time near that date. The hypothetical question and its implications are as follows:
 

 “Now, Mr. Walt, you are here considering the writing of a man who, it has been testified to, was stricken with paralysis which affected his whole right side and his inability [ability] to use therefore his right hand. He was not before then ambidextrous, and so he was subjected, whenever he did write, to use his left hand. That required him to write all over again and coordinate the muscles of his left arm to do the work which his right arm theretofore did. In order to escape writing, he used to typewrite and he typed with one or two fingers the letters which he wrote. Now, he did that over a series of years and
 
 all he ever wrote with pen and ink was his signature.
 
 Now, assuming such a man, after being paralyzed for eighteen years on his entire right side, using his left hand to write when he had to write,
 
 only for writing his
 
 name, that he was called upon to write something more lengthy than his signature, wouldn’t he experience great difficulty?” [The italics are ours.]
 

 The two persons on whose testiinony the document in question was probated, as the will of Dr. Buck, testified frankly on the trial of this case that the only handwriting of Dr. Buck that they had ever seen was his signature. In fact, as we have shown, it is not disputed that Dr. Buck was never able to write anything with a pen except his name after he was first stricken with the cerebral hemorrhage, eighteen dr twenty years before he died. As he was neither left-handed nor ambidextrous he was
 
 *573
 
 obliged to learn to coordinate the muscles of his left hand so that he could write his name with a pen, but he never learned to write with a pen anything more than his name after he lost the use of his right hand. For the purpose of writing letters, and particularly to continue his custom of writing to his sister, Miss Edith Buck, he learned to write on a typewriter, using only two fingers of his left hand. Several of these letters were introduced in evidence on the trial of this case.
 

 It appears that the judge in probating the document purporting to be the will of Dr. Buck did not observe the requirements of Article 1655 of the Civil Code, as amended by Act No. 119 of 1896. The requirements are stated in the article, as amended by the act of 1896, thus:
 

 “The judge shall interrogate the witnesses under oath touching their knowledge of the testator’s handwriting and signature and shall satisfy himself that they are familiar therewith making mention of the whole in his proces verbal thereof.”
 

 That paragraph, which we have quoted from article 1655 of the Civil Code, was substituted, by the act of 1896, for the original requirement that the two witnesses should attest that they had “often seen him [the testator] write and sign during his lifetime.”
 

 Article 1655 of the Revised Civil Code of 1870, before it was amended by the act of 1896, read exactly as it read when it was originally adopted, as article 1648' of the Code of 1825, thus:
 

 “The olographic testament shall be opened, if it be sealed; and it must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator’s handwriting, as having often seen him write and sign during his lifetime.”
 

 As amended by the act of 1896, the article now reads:
 

 “The olographic testament shall be opened, if it be sealed and it must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator’s handwriting.
 

 “The judge shall interrogate the witnesses under oath touching their knowledge of the testator’s handwriting and signature and shall satisfy himself that they are familiar therewith making mention of the whole in his proces verbal thereof.”
 

 In this case the judgment of probate — or proces verbal — was written on an old printed form, which conformed with article 1655 of the Civil Code before the article was amended by the act of 1896, and which was therefore obsolete. All that is stated in the proces verbal, or judgment of probate, as proof of the genuineness of the handwriting and signature of the alleged testator is that, the document, “being by me' [the judge] exhibited to the aforesaid witnesses, was by them recognized and declared to be entirely written, dated and signed by the testator, the said Dr. Charles
 
 *575
 
 Collins Buck, which they attest as having often seen him write and sign during his lifetime.” It is not stated in the proces verbal that the judge interrogated the witnesses under oath, touching their knowledge of the handwriting and signature of Dr. Buck, or that the judge satisfied himself that the witnesses were familiar with the handwriting of’ Dr. Buck.
 

 Mrs. Pautsch, in her petition to have the alleged will of Dr. Buck probated, averred that it was dated December 6, 1939. The judge probated it as bearing that date. Our reason for pointing out that Dr. Buck could not have written the document in question, not only on that day, but on any day near December 6, 1939, is that, if Dr. Buck had commenced writing his will previous to December 6, 1939, and had finished writing it on or about that day and had dated it plainly and unmistakably December 6, 1939, the will would not have been invalid merely because of its having been written, either wholly or partly, before that date. On the proof which is required by article 1655 of the Civil Code, that the will was “entirely written, dated and signed by the hand of the testator,” as provided in article 1588 of the Civil Code, the will would have been a valid will as of date December 6, 1939, even though it might have been written wholly or partly before that date. Succession of Cunningham, 142 La. 701, 77 So. 506; Succession of Guiraud, 164 La. 620, 114 So. 489; Picard v. Succession of Picard, 179 La. 746, 155 So. 11.
 

 But, in this case, the instrument in contest is not dated, plainly or unmistakably, December 6, 1939. What purports tó be the date line, at the beginning of the instrument, and again at the end of it, is very uncertain, particularly as to what year was really given. That is one of the causes for which alone the plaintiffs in this case contend that the instrument is not a valid will; that is, that it has not a certain or a definite date.
 

 Mrs. Pautsch, who is named as the universal legatee and executrix, in the document, does not contend that it might have been written sometime before the date which she says it bears. In fact, the question as to when the instrument was actually written is a matter of no importance when we come to consider -the question whether it bears a certain and unmistakable date; because, if it does not bear a. certain and definite date it is invalid for want of an essential requirement as to form.
 

 In the date line, at the beginning and again at the end of the instrument, the day and the month might be deemed plain enough, but the year is very uncertain. At the beginning of the instrument the year appears to be 1999, or 1994, which are of course impossible dates. The year written at the end of the instrument was first written, apparently, 1919, and the numeral 3 seems to have been written over (surchargé) the second 1, so as to convert the 1919 into something like 1939. And the numerals 39 were afterwards scratched out. All of which is made obvious in the photostats and enlargements made by the handwriting expert, and is explained in his testimony. The year is written twice in what
 
 *577
 
 purports to be the date line at the end of the instrument. As written finally the year appears to have been written first 1919, or 1911, or 1991; and it seems that an attempt was made afterwards to convert the year into 1939 — by what the French commentators call surcharge. It is possible —even probable — that a majority of persons reading the date line at the end of the instrument would conclude that it is dated December 6, 1939; but there is considerable doubt about that. The one fact which is certain, concerning the date of the instrument, is that the date is uncertain. To demonstrate this we produce here a facsimile of the date line at the beginning of the instrument:
 

 And here is a facsimile of the date line at the end of the instrument:
 

 It is well setted that, under article 1588 of the Civil Code, declaring that an olographic testament, in order to be valid, must be entirely written,
 
 dated
 
 and signed by the hand of the testator, and article 1655 requiring proof by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written,
 
 dated
 
 and signed in the handwriting of the testator, if the date appearing on the instrument is uncertain, it is not a valid olographic will. It was so declared literally in the Succession of Curtis, 149 La. 487, 89 So. 629, and, substantially, in the following cases: Fuentes v. Gaines, 25 La.Ann. 85, 107; Heffner v. Heffner, 48 La. Ann. 1088, 20 So. 281; Succession of Robertson, 49 La.Ann. 868, 21 So. 586, 62 Am. St.Rep. 672; Succession of Swanson, 132 La. 606, 61 So. 685; Succession of Wenling, 172 La. 673, 135 So. 21.
 

 This pronouncement in the Succession of Curtis, 149 La. 487, 89 So. 629, 630, is supported by the French authorities, and is very appropriate, viz.:
 

 “It is well settled that, if any part of the date appearing on an instrument purporting to be an olographic testament is doubtful or uncertain, whether as to the day, month or year, the effect of the uncertainty or doubt about the date is the same as if the instrument were not dated at all; such an instrument is not a valid olographic testament. The will in question was probated as being dated October 5, 1918. The last figure in the date line has the appearance of having been converted from the figure 0 or the figure 6 into the figure 8; and the date appears yet as much like October 5, 1910, as like October 5, 1918.”
 

 Article 1588 is a free translation of article 970 of the Code Napoleon, now called Code Civil Francais, a literal translation of which in Louisiana Legal Archives, Vol. 3, Part I, p. 876, is as follows :
 

 “The olographic testament shall not be valid unless it is entirely written, dated and signed by the hand of the testator: it is subject to no other form.”
 

 The French commentators on article 970 of the Code Civil Francais — both the old and the modern commentators — are unani
 
 *579
 
 mous in their opinion that an incomplete or uncertain date in what purports to he an olographic will is equivalent to no date, and renders the instrument null.
 

 Carpentier et Du Saint, in their Repertoire du Droit Francais, Vol. 35, sec. 478 and sec. 481, state the rule thus :
 

 “No. 478. Although the date is not tied down to any sacramental form of expression, at least must it be certain in order that it may answer. Uncertainty in the date is equivalent to no date at all and renders the will null.”
 

 “No. 481. The date is again uncertain if, for instance, it is surcharged [meaning written over] in such way that it - cannot be read, or that the judges remain undecided between two dates equally apparent.”
 

 Baudry-Lacantinerie, Traite de Droite Civil, Vol. 11, Part 2, Sec. 1960, gives the rule thus:
 

 “Hitherto, we have spoken only of the inexact date. The same principles are applicable to the incomplete date, for example, as to the date indicating the month and the year, but not the day, of the confection of the will. They apply equally to the uncertain date; for example, that which has been written over [surchargé] in such manner that it shows two dates.
 

 “An incomplete date, or an uncertain date, as clearly fails to comply with the form prescribed by article 970, Code Civil, as does an incorrect date.
 

 “The testament bearing an incomplete or uncertain date is, therefore, null and void, for the same reason as a testament not dated or bearing a date which is not correct.”
 

 Demolombe, Donations Entre-Vifs- — ■ Testaments, Vol. 4, Sec. 85, states the rule thus:
 

 “Is an uncertain date sufficient? Evidently, No. The date is, as we have said, the precise indication of the day, the month and the year of the making of the will; so that the date which leaves uncertainty as to any one of these three elements does not indicate it in a precise manner. Hence, such date is not sufficient;' or rather it is not a date in the sense of article 970.”
 

 Demolombe, in sec. 86 of the same volume, points out that there were some commentators who thought that the certainty of the day, in an olographic teestament, was not indispensable, if the month and year were stated plainly in the instrument; but the author expresses as his own opinion that certainty of the day, in the date given in an olographic will, is as essential as certainty of the month and year; and he declares that the commentators are unanimous in their opinion that uncertainty with regard to the year stated in the date line of an olographic will renders the will null.
 

 Merlin, Repertoire de Jurisprudence, Vol. 17, Sec. II, Par. I, Art. VI, p. 302, states the rule thus:
 

 “Does the uncertainty of the date of a will vitiate it? Yes, without doubt. The object of the law, in requiring the date to a testament, is to fix the exact time of its confection. But this object cannot he carried out by an uncertain date. There is,
 
 *581
 
 therefore, no difference between an uncertain date and an omitted date.”
 

 Marcade, Droit Civil Francais, Vol. 4, Tit. II, Art. 970, p. 10, states the rule thus:
 

 “An incomplete date entails the nullity of the testament because the will then shows only a part of a date and not a date. Thus the date which, because of the omission of words, or as a result of superimpositions [surchargés] or erasures, shows only the words ‘done at Paris, May 10th Seventeen’, must be declared null.”
 

 Aubry et Rau, Droit Civil Francais, Vol. 10, sec. 668, pp. 615, 616, state the rule thus:
 

 “An olographic testament is null when it is not dated, that is to say, when it does not bear (in the hand of the testator) the precise indication of the day, the month and the year in which it was written.
 

 *
 
 * * * * *
 

 “The uncertainty of the date, or the omission of one of the elements which compose it, must be assimilated to the absolute absence of a date.”
 

 Boileux, Commentaire Sur Le Code Civil, Vol. 4, Sec. 1, p. 92, states the rule thus:
 

 “The date can be rectified by means of the tenor of the paper on which the testament is written. But one cannot rectify errors by conjecture .or inference. In case of doubt the nullity must be pronounced.”
 

 Duranton, Cours De Droit Francais, Vol. 9, p. 36, states the rule thus:
 

 “In principle, an irregular date, or one incorrectly expressed, is not a date, in the sense of the law, because it does not indicate the time when the testament was made. Such would be the case where the
 
 day
 
 or the
 
 month
 
 or the
 
 year
 
 is omitted or erased, or crossed out or written over [surcharge] in such manner that the true date cannot be clearly read, or even when it is established that the date, though written correctly is nevertheless false.”
 

 Laurent, Droit Civil Francais, Vol. 13, pp. 200 and 203, makes the following comment :
 

 “Many testaments have been annulled because they were not dated or because the date was incomplete, uncertain or incorrect, even though the testator had never ceased to be capable of making a will, and even though he had made only a single testament. * * * * *
 

 “The date is uncertain when the testator, in writing over it [en la surchargeant] has rendered it illegible, or when he has written, by superimposition [en surcharge] another date without obliterating the first. In such case, one does not know which is the day on which the testament was written, hence it has no date; which entails its nullity. It would be thus even when the uncertainty existed only with respect to the day, since the day is an essential element of the date.”
 

 Dalloz, Repertoire, Vol. 16, Sec. 2660, p. 759, states the rule thus:
 

 “The date deserves credit only when it is certain. The uncertainty of a 'date vitiates an olographic testament exactly the same as' its absolute omission. M. Merlin regards this rule as incontestible and M.
 
 *583
 
 Troplong follows his opinion. It has been consecrated in a decision which holds that an olographic testament, in which the date is uncertain, can be assimilated to an undated testament;” et cetera.
 

 Fuzier-Herman, Repertoire du Droit Francais, Vol. 35, Sec. 478 and 481, states the rule as follows:
 

 “478. Although the date is not subject to any sacramental form of expression, at least it is essential to its validity that it be certain. The uncertainty of the date is equivalent to the absence of any date and renders the testament null.”
 

 “481. The date is uncertain if, for example, it is written over in such fashion that one cannot read it or the judges remain undecided between two dates equally apparent.”
 

 Planiol et Ripert, Droit Civil, Vol. 3, Sec. 2692, p. 728, states the rule thus:
 

 “An incorrect date and an incomplete date are one and the same. They equally entail the nullity of the testament. The French jurisprudence is constant on this point.”
 

 In Hue’s, Commentaire Du Code Civil, Tome 6, p. 354, the rule which is most appropriate to this case, if we assume that the instrument in contest was written, dated and signed by Dr. Buck, is stated thus:
 

 “If the testator has written by superimposing [en surcharge] another date, without obliterating the first, the date would be uncertain and the testament is null.”
 

 Justice Spofford’s tribute to the French jurists, in Johnson v. Bloodworth, 12 La. Ann. 699, loc. cit. 701, deserves to be resurrected here:
 

 “When jurists of a race so much addicted to theoretical speculation, and so little addicted to reverence for each other’s opinions, draw a conclusion from the Code in which they unanimously concur, we may, perhaps, set it down for an obvious truth.”
 

 The i evidence has convinced us that Dr. Buck did not write the instrument in contest. If he did write it, it is not a valid olographic testament, as a matter of form, because of the uncertainty of its date.
 

 The judgment appealed from is annulled, the instrument in contest, probated on August 21, 1941, as the olographic testament of Dr. Charles Collins Buck, is adjudged null; the judgment of probate, and the appointment of an executrix, are annulled; and the case is ordered remanded to the civil district court in order that the Succession of Dr. Charles Collins Buck may be dealt with as an intestate succession, in accordance with the prayer of the plaintiffs’ petition, and the opinion which we have expressed. The costs of this proceeding are to be borne by the succession.
 

 HIGGINS, J., takes no part.